# TEXAS AND PACIFIC RAILWAY COMPANY *v.* INTERSTATE COMMERCE COMMISSION.

**APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.**

No. 321.  Argued January 29, 30, 1896. — Decided March 30, 1896.

The Interstate Commerce Commission is a body corporate, with legal capacity to be a party plaintiff or defendant in the Federal courts.

The Circuit Court for the Southern District of New York had jurisdiction of the acts complained of in this suit.

The Southern Pacific Company, although a proper, was not a necessary party to this suit.

In enacting the interstate commerce acts Congress had in view, and intended to make provision for commerce between States and Territories, commerce going to and coming from foreign countries, and the whole

field of commerce except that wholly within a State; and it conferred upon the Commission the power of determining whether, in given cases, the services rendered were like and contemporaneous, whether the respective traffic was of a like kind, and whether the transportation was under substantially similar circumstances and conditions.

If the Commission has power, of its own motion, to promulgate general decrees or orders, which thereby become rules of action to common carriers, such exertion of power must be confined to the obvious purposes and directions of the statute, since Congress has not granted it legislative powers.

The action of the defendant company in procuring from abroad, by steamship connections, through traffic for San Francisco which, except for the modified through rates, would not have reached the port of New Orleans, and in taking its *pro rata* share of such rates, was not of itself an act of "unjust discrimination" within the meaning of the interstate commerce act.

In construing the terms of a statute, especially when the legislation is experimental, courts must take notice of the history of the legislation, and, out of different possible constructions, must select the one that best comports with the genius of our institutions.

In enacting the statutes establishing the Interstate Commerce Commission, the purpose of Congress was to facilitate and promote commerce, and not to reinforce the provisions of the tariff laws; and the effort of the Commission to deprive inland consumers of the advantage of through rates, seems to create the mischief which it was one of the objects of the act to remedy.

The conclusions of the court, drawn from the history and language of the acts under consideration, and from the decisions of the American and the English courts, are:

    (1) That the purpose of the act is to promote and facilitate commerce by the adoption of regulations to make charges for transportation just and reasonable, and to forbid undue and unreasonable preferences or discriminations;

    (2) That in passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the Commission or the courts, is empowered to fully consider all the circumstances and conditions that reasonably apply to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests as well of the carrying companies as of the traders and shippers, and in considering whether any particular locality is subjected to an undue preference or disadvantage the welfare of the communities occupying the localities where the goods are delivered is to be considered as well as that of the communities which are in the locality of the place of shipment;

    (3) That among the circumstances and conditions to be considered, as well in the case of traffic originating in foreign ports as in the case of traffic originating within the limits of the United States,

competition that affects rates should be considered, and in decid-
ing whether rates and charges made at a low rate to secure for-
eign freights which would otherwise go by other competitive
routes are or are not undue and unjust, the fair interests of the
carrier companies and the welfare of the community which is to
receive and consume the commodities are to be considered;

(4) That if the Commission, instead of confining its action to redress-
ing on complaint made by some particular person, firm, corpora-
tion, or locality, some specific disregard by common carriers of
provisions of the act, proposes to promulgate general orders,
which thereby become rules of action to the carrying companies,
the spirit and letter of the act require that such orders should
have in view the purpose of promoting and facilitating commerce,
and the welfare of all to be affected, as well the carriers as the
traders and consumers of the country.

The mere fact that in this case the disparity between through and local
rates was considerable did not warrant the Circuit Court of Appeals in
finding that such disparity constitutes an undue discrimination, espe-
cially as that disparity was not complained of by any one affected thereby.

THIS was an appeal from a decree of the United States Cir-
cuit Court of Appeals for the Second Circuit, affirming a
decree of the Circuit Court of the United States for the South-
ern District of New York, filed October 5, 1892.

The original bill of complaint was brought by the Inter-
state Commerce Commission, created by virtue of an act of
Congress, entitled "An act to regulate commerce," approved
February 4, 1887, c. 104, 24 Stat. 379, as amended by an act
approved February 10, 1891, c. 128, 26 Stat. 743, against the
Texas and Pacific Railway Company, a corporation chartered
and existing under and by virtue of the laws of the United
States, having its principal office at New York City.

The object of the bill was to compel the defendant com-
pany to obey an order of the Interstate Commerce Commis-
sion, made on January 29, 1891, whereby the said defendant
was ordered to "forthwith cease and desist from carrying any
article of imported traffic shipped from any foreign port
through any port of entry of the United States, or any port of
entry in a foreign country adjacent to the United States, upon
through bills of lading destined to any place within the
United States, at any other than upon the inland tariff cover-
ing other freight from such port of entry to such place of des-

tination, or at any other than the same rates established in such inland tariff for the carriage of other like kind of freight, in the elements of bulk, weight, value and expense of carriage;" and which order the said defendant was alleged to have wholly disregarded and set at naught.

It appears by the bill that on March 23, 1889, the Commission, of its own motion and without a hearing of the parties to be affected, had made a certain order wherein, among other things, it was provided as follows:

"Imported traffic transported to any place in the United States from a port of entry or place of reception, whether in this country or in an adjacent foreign country, is required to be taken on the inland tariff governing other freights." 2 Interstate Com. Com. Rep. 658.

Subsequently complaint was made to the Interstate Commerce Commission, in a petition filed by the New York Board of Trade and Transportation, that certain railroad companies were disregarding said order, and, in violation of the act to regulate commerce, were guilty of unjust discrimination in that they were in the habit of charging the regular tariff rates upon property when delivered to them at New York and Philadelphia for transportation to Chicago and other Western points, while charging other persons rates which were lower and even fifty per cent thereof for a like and contemporaneous service under substantially similar circumstances and conditions, when the property was delivered to them at New York or Philadelphia by vessel or steamship lines, under through bills of lading from foreign ports and foreign interior points, issued under an arrangement between the said railroad companies and such vessels and steamship lines and foreign railroads, for the continuous carriage at joint rates from the point or port of shipment to Chicago and other Western points, the railroad companies' share of each through rate being lower than their regular tariff rates.

The Commercial Exchange of Philadelphia and the San Francisco Chamber of Commerce intervened and became parties complainant also.

The companies first warned and called upon to answer the

complainant were the Pennsylvania Railroad Company, the Pittsburgh, Ft. Wayne and Chicago Railway Company, and the Pittsburgh, Cincinnati and St. Louis Railway Company, but, after the coming in of the answers of said companies, it was deemed necessary to make quite a number of other railroad companies parties defendant — among them the Texas and Pacific Railway Company, the defendant in the present case, and the Southern Pacific Company. The several defendant companies filed answers. The answer of the Texas and Pacific Railway Company, admitting that both before and since March 23, 1889, it had carried imported traffic at lower rates than it contemporaneously charged for like traffic originating in the United States, justified by claiming that through shipments from a foreign country to the interior of the United States differ in circumstances and conditions from shipments originating at the American sea-board bound for the same interior points, and that defendant company has a legal right to accept for its share of the through rate a lower sum than it receives for domestic shipment to the same destination from the point at which the imported traffic enters this country.

The result of the hearing before the Interstate Commerce Commission was, so far as the present case is concerned, that the Commission held that the Texas and Pacific Railway Company was not justified in accepting, as its share of a through rate on imported traffic, a less charge or sum than it charged and received for inland traffic between the port of reception and the point of delivery, and the said order of January 29, 1891, commanding that said company desist from distinguishing in its charges between foreign and inland traffic, was made. 4 Interstate Com. Com. Rep. 447.

As the Texas and Pacific Railway Company declined to observe said order, the Commission filed its present bill against said company in the Circuit Court of the United States for the Southern District of New York.

The railway company filed a plea in abatement, denying that its principal office was in the Southern District of New York, and denying that it had violated or disobeyed the order of the Commission within the State of New York, or

at any place within the jurisdiction of the Circuit Court. Certain affidavits were filed, upon a stipulation, as to the facts, and, after hearing, the plea was overruled, and also a motion to dismiss the proceedings for want of jurisdiction was denied — and to these rulings exceptions were taken and allowed.

The defendant company answered, alleging that the Interstate Commerce Commission was not a corporation, person or body politic capable of bringing or maintaining this suit — that the petition or bill failed to allege or show any facts constituting a violation by the defendant of the order of January 29, 1891, and did not show or allege any specific act or acts by the defendant in violation of the act of Congress — that the Southern Pacific Company, as participant with the defendant in the making and division of the through rates, was a necessary party, and that the bill should be dismissed for want of such necessary party.

The answer, admitting that the company had charged and received, since January 29, 1891, rates for the transportation of commodities from Liverpool and London, England, via New Orleans and the Texas and Pacific Railway and the Southern Pacific Company to San Francisco, California, different from the rates charged and received for the transportation of inland commodities from New Orleans by the same route to San Francisco, asserted that it had a legal right so to do, and that such action was not in violation of the act of Congress regulating commerce, or of any valid order of the Interstate Commerce Commission. The answer set up a number of facts which it alleged sustained its defence.

The cause was heard upon the petition, answer and sundry exhibits, and resulted in a decree declaring that the order of January 29, 1891, was lawful, and that the same had been disobeyed by the defendant, and enjoining the defendant from further continuing such disobedience of said order. An appeal, with errors assigned, was taken from this decree to the Circuit Court of Appeals of the Second Circuit, by which, on June 3, 1893, the decree of the Circuit Court was affirmed with costs. 20 U. S. App. 1. An appeal was then taken, on errors assigned, from said decree to this court.

*Mr. John F. Dillon* and *Mr. E. Baxter,* (with whom was *Mr. Winslow F. Pierce* on the brief,) for appellant.

*Mr. Simon Sterne* and *Mr. John D. Kernan* for appellee.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

It was claimed in the courts below, and it is also urged in this court, that the Interstate Commerce Commission is not a corporate body or person in whose name a suit can be instituted.   It seems to be thought that the Commission can only sue in the names of the persons composing it.

The 16th section of the act to regulate commerce, as amended March 2, 1889, c. 382, 25 Stat. 859, provides that " whenever any common carrier, as defined in and subject to the provisions of that act, shall violate, or refuse or neglect to obey or perform, any lawful order or requirement of the Commission created by the act, not founded upon a controversy requiring a trial by jury, as provided by the Seventh Amendment to the Constitution of the United States, it shall be lawful for the Commission, or for any company or person interested in such order or requirement, to apply in a summary way, by petition, to the Circuit Court of the United States sitting in equity in the judicial district in which the common carrier complained of has its principal office, or in which the violation or disobedience of such order or requirement shall happen, alleging such violation or disobedience, as the case may be ; and the said court shall have power to hear and determine the matter, on such short notice to the common carrier complained of as the court shall deem reasonable ; and such notice may be served on such common carrier, his or its officers, agents or servants, in such manner as the court shall direct ; and said court shall proceed to hear and determine the matter speedily as a court of equity, and without the formal pleadings and proceedings applicable to ordinary suits in equity, but in such manner as to do equity in the premises."

The language contained in the 11th section creating the Commission is as follows, act of February 4, 1887, c. 104, 24 Stat. 379, 383: "That a Commission is hereby created and established to be known as the Interstate Commerce Commission, which shall be composed of five commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate. . . . No vacancy in the Commission shall impair the right of the remaining commissioners to exercise all the powers of the Commission," and in the 17th section it is provided that "said Commission shall have an official seal, which shall be judicially noticed."

In the case of *Interstate Commerce Commission* v. *Baltimore & Ohio Railroad*, a suit was instituted by the Commission in the Circuit Court of the United States for the Southern District of Ohio, and the decree of that court was affirmed by this court. 145 U. S. 264. Likewise, in the case of *Interstate Commerce Commission* v. *Atchison, Topeka & Santa Fé Railroad*, a suit was brought in the Circuit Court of the United States for the District of California, by the Commission *eo nomine* against that company, wherein it was held by this court that an appeal did not lie directly to this court since the creation of the Circuit Court of Appeals. 149 U. S. 264.

In neither of these cases was any objection made to the right of the Commission to sue by its statutory designation.

We think that the language of the statute, in creating the Commission, and in providing that it shall be lawful for the Commission to apply by petition to the Circuit Court sitting in equity, sufficiently implies the intention of Congress to create a body corporate with legal capacity to be a party plaintiff or defendant in the Federal Courts.

Another formal objection made to the jurisdiction of the Circuit Court was raised by a plea in abatement denying that the Texas and Pacific Railway Company had its principal office in the State of New York, or that the acts complained of took place within the judicial district of said court.

Upon facts made to appear by affidavits submitted by both parties, under a stipulation, the Circuit Court overruled the plea. Our examination of the facts so submitted, and which

are brought before us by a bill of exceptions, has not convinced us that the court erred in overruling the plea.

Another objection urged is that, as the order of the Commission involves rates participated in by the Southern Pacific Company, as owner of a portion of the line over which the through freight is carried, that company was a necessary party. Undoubtedly that company would have been a proper party, but we agree with the Circuit Court in thinking that it was not a necessary one.

We come now to the main question of the case, and that is whether the Commission erred, when making the order of January 29, 1891, in not taking into consideration the ocean competition as constituting a dissimilar condition, and in holding that no circumstances and conditions which exist beyond the sea-board in the United States could be legitimately regarded by them for the purpose of justifying a difference in rates between import and domestic traffic.

The answer of the Texas and Pacific Railway Company to the petition of the New York Board of Trade and Transportation before the Interstate Commerce Commission, and the answer of said company to the petition of the Commission filed in the Circuit Court, allege that rates for the transportation of commodities from Liverpool and London, England, to San Francisco, California, are in effect fixed and controlled by the competition of sailing vessels for the entire distance; by steamships and sailing vessels in connection with railroads across the Isthmus of Panama; by steamships and sailing vessels from Europe to New Orleans, connecting these under through arrangements with the Southern Pacific Company to San Francisco: That, unless the defendant company charges substantially the rates specified in its answer, it would be prevented, by reason of the competition aforesaid, from engaging in the carrying and transportation of property and import traffic from Liverpool and London to San Francisco, and would lose the revenue derived by it therefrom, which is considerable, and important and valuable to said company: That the rates charged by it are not to the prejudice or disadvantage of New Orleans, and work no injury to that community,

because, if said company is prevented from participating in said traffic, such traffic would move via the other routes and lines aforesaid without benefit to New Orleans, but, on the contrary, to its disadvantage: That the foreign or import traffic is upon orders by persons, firms and corporations in San Francisco and vicinity buying direct of first hands in London, Liverpool, and other European markets; and if the order of the Commission should be carried into effect it would not result in discontinuance of that practice or in inducing them to buy in New Orleans in any event: That the result of the order would be to injuriously affect the defendant company in the carriage of articles of foreign imports to Memphis, St. Louis, Kansas City and other Missouri River points: And that by such order the defendant company would be prevented from competing for freight to important points in the State of Texas with the railroad system of that State, having Galveston as a receiving port, and which railroad system is not subject to the control of the Interstate Commerce Commission. These allegations of the answer were not traversed or denied by the Commission, but are confirmed by the findings of the Commission attached as an exhibit to the petition in the case; and by said findings it further appears that the proportion the Texas and Pacific Railway receives of the through rate is remunerative — that the preponderance of its empty cars go north during eight months of the year, and if something can be obtained to load, it is that much found, and anything is regarded as remunerative that can be obtained to put in its cars to pay mileage — that the competition which controls the making of rates to the Pacific coast is steamship by way of the Isthmus and in cheap heavy goods around Cape Horn — that the competition to interior points, such as Missouri River points and Denver, is from the trunk lines direct from the Atlantic sea-board — that the ships engaged in carrying to San Francisco around Cape Horn are almost wholly British bottoms — that the through bill of lading furnishes a collateral for the transaction of business, takes from the shipper and consignee both the care as to intermediate charges, elevators, wharves and cost of handling, and puts it on the

carrier; it reduces the intermediate charges, very much facilitates the transaction of business, and helps to swell its volume — and that the tendency of the through bill of lading is to eliminate the obstacles between the producer and consumer, and it has done much in that direction.

These and other uncontroverted facts that appear in this record would seem to constitute "circumstances and conditions" worthy of consideration, when carriers are charged with being guilty of unjust discrimination or of giving unreasonable and undue preference or advantage to any person or locality.

But we understand the view of the Commission to have been that it was not competent for the Commission to consider such facts — that it was shut up by the terms of the act of Congress, to consider only such "circumstances and conditions" as pertained to the articles of traffic after they had reached and been delivered at a port of the United States or Canada.

It is proper that we should give the views of the Commission in its own words:

"The statute has provided for the regulation of interstate traffic by interstate carriers, partly by rail and partly by water, or all rail, shipped from one point in the United States to another destination within the United States, or from a point of shipment in the United States to a port of entry within the United States or an adjacent foreign country, or from a port of entry either within the United States or in an adjacent foreign country, on import traffic brought to such port of entry from a foreign port of shipment and destined to a place within the United States. In providing for this regulation the statute has also provided for the methods of such regulation by publication of tariffs of rates and charges at points where the freight is received and at which it is delivered, and also for taking into consideration the circumstances and conditions surrounding the transportation of the property. The statute has undertaken no such regulation from foreign ports of shipment to ports of entry either within the United States or to ports of entry in an adjacent foreign country, and as between these ports has provided for no publication of tar-

iffs of rates and charges, but has left it to the unrestrained competition of ocean carriers and all the circumstances and conditions surrounding it. These circumstances and conditions are indeed widely different in many respects from the circumstances and conditions surrounding the carriage of domestic interstate traffic between the States of the American Union by rail carriers; but as the regulation provided for by the act to regulate commerce does not undertake to regulate or govern them, they cannot be held to constitute reasons in themselves why imported freight brought to a port of entry of the United States or a port of entry of an adjacent foreign country destined to a place within the United States should be carried at a lower rate than domestic traffic from such ports of entry respectively to the places of destination in the United States over the same line and in the same direction. To hold otherwise would be for the Commission to create exceptions to the operation of the statute not found in the statute; and no other power but Congress can create such exception in the exercise of legislative authority.

"In the one case the freight is transported from a point of origin in the United States to a destination within the United States, or port of transhipment, if it be intended for export, upon open published rates, which must be reasonable and just, not unjustly preferential to one kind of traffic over another, and relatively fair and just as between localities; and the circumstances and conditions surrounding and involved in the transportation of the freight are in a very high degree material. In the other case the freight originates in a foreign country, its carriage is commenced from a foreign port, it is carried upon rates that are not open and published, but are secret, and in making these rates it is wholly immaterial to the parties making them whether they are reasonable and just or not, so they take the freight and beat a rival, and it is equally immaterial to them whether they unjustly discriminate against surrounding or rival localities in such foreign country or not. Imported foreign merchandise has all the benefit and advantage of rates thus made in the foreign ports; it also has all the benefit and advantage of the low rates made in the

ocean carriage arising from the peculiar circumstances and conditions under which that is done; but when it reaches a port of entry of the United States, or a port of entry of a foreign country adjacent to the United States, in either event upon a through bill of lading, destined to a place in the United States, then its carriage from such port of entry to its place of destination in the United States under the operation of the act to regulate commerce must be under the inland tariff from such port of entry to such place of destination, covering other like kind of traffic in the elements of bulk, weight, value and of carriage; and no unjust preference must be given to it in carriage or facilities of carriage over other freight. In such case all the circumstances and conditions that have surrounded its rates and carriage from the foreign port to the port of entry have had their full weight and operation, and in its carriage from the port of entry to the place of its destination in the United States, the mere fact that it is foreign merchandise thus brought from a foreign port is not a circumstance or condition, under the operation of the act to regulate commerce, which entitles it to lower rates or any other preference in facilities and carriage over home merchandise, or other traffic of a like kind carried by the inland carrier from the port of entry to the place of destination in the United States for the same distance and over the same line. . . .

"The act to regulate commerce will be examined in vain to find any intimation that there shall be any difference made in the tolls, rates or charges for, or any difference in the treatment of home and foreign merchandise in respect to the same or similar service rendered in the transportation, when this transportation is done under the operation of this statute. Certainly it would require a proviso or exception plainly engrafted upon the face of the act to regulate commerce, before any tribunal charged with its administration would be authorized to decide or hold that foreign merchandise was entitled to any preference in tolls, rates or charges made for, or any difference in its treatment for, the same or similar service as against home merchandise. Foreign and home merchandise, therefore, under the operation of this statute, when

handled and transported by interstate carriers, engaged in carriage in the United States, stand exactly upon the same basis of equality as to tolls, rates, charges and treatment for similar services rendered.

"The business complained of in this proceeding is done in the shipment of foreign merchandise from foreign ports through ports of entry of the United States, or through ports of entry in a foreign country adjacent to the United States, to points of destination in the United States, upon through bills of lading." 4 Interstate Com. Com. Rep. 512–516.

It is obvious, therefore, that the Commission, in formulating the order of January 29, 1891, acted upon that view of the meaning of the statute which is expressed in the foregoing passages.

We have, therefore, to deal only with a question of law, and that is, what is the true construction, in respect to the matters involved in the present controversy, of the act to regulate commerce? If the construction put upon the act by the Commission was right, then the order was lawful; otherwise it was not.

Before we consider the phraseology of the statute, it may be well to advert to the causes which induced its enactment. They chiefly grew out of the use of railroads as the principal modern instrumentality of commerce. While shippers of merchandise are under no legal necessity to use railroads, they are so practically. The demand for speedy and prompt movement virtually forbids the employment of slow and old fashioned methods of transportation, at least in the case of the more valuable articles of traffic. At the same time, the immense outlay of money required to build and maintain railroads, and the necessity of resorting, in securing the rights of way, to the power of eminent domain, in effect disable individual merchants and shippers from themselves providing such means of carriage. From the very nature of the case, therefore, railroads are monopolies, and the evils that usually accompany monopolies soon began to show themselves, and were the cause of loud complaints. The companies owning the railroads were charged, and sometimes truthfully, with mak-

ing unjust discriminations between shippers and localities, with making secret agreements with some to the detriment of other patrons, and with making pools or combinations with each other, leading to oppression of entire communities.

Some of these mischiefs were partially remedied by special provisions inserted in the charters of the companies, and by general enactments by the several States, such as clauses restricting the rates of toll, and forbidding railroad companies from becoming concerned in the sale or production of articles carried, and from making unjust preferences. Relief, to some extent, was likewise found in the action of the courts in enforcing the principles of the common law applicable to common carriers—particularly that one which requires uniformity of treatment in like conditions of service.

As, however, the powers of the States were restricted to their own territories, and did not enable them to efficiently control the management of great corporations whose roads extend through the entire country, there was a general demand that Congress, in the exercise of its plenary power over the subject of foreign and interstate commerce, should deal with the evils complained of by a general enactment, and the statute in question was the result.

The scope or purpose of the act is, as declared in its title, to regulate commerce. It would, therefore, in advance of an examination of the text of the act, be reasonable to anticipate that the legislation would cover, or have regard to, the entire field of foreign and interstate commerce, and that its scheme of regulation would not be restricted to a partial treatment of the subject. So, too, it could not be readily supposed that Congress intended, when regulating such commerce, to interfere with and interrupt, much less destroy, sources of trade and commerce already existing, nor to overlook the property rights of those who had invested money in the railroads of the country, nor to disregard the interests of the consumers, to furnish whom with merchandise is one of the principal objects of all systems of transportation.

Addressing ourselves to the express language of the statute, we find, in its first section, that the carriers that are declared

to be subject to the act are those "engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management or arrangement, for a continuous carriage or shipment, from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transhipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country.".

It would be difficult to use language more unmistakably signifying that Congress had in view the whole field of commerce (excepting commerce wholly within a State) as well that between the States and Territories as that going to or coming from foreign countries.

In a later part of the section it is declared that "the term 'transportation' shall include all instrumentalities of shipment or carriage."

Having thus included in its scope the entire commerce of the United States, foreign and interstate, and subjected to its regulations all carriers engaged in the transportation of passengers or property, by whatever instrumentalities of shipment or carriage, the section proceeds to declare that "all charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

The significance of this language, in thus extending the judgment of the tribunal established to enforce the provisions of the act to the entire service to be performed by carriers, is obvious.

Proceeding to the second section, we learn that its terms forbid any common carrier, subject to the provisions of the act, from charging, demanding, collecting or receiving "from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of the act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions," and declares that disregard of such prohibition shall be deemed "unjust discrimination," and unlawful.

Here, again, it is observable that this section contemplates that there shall be a tribunal capable of determining whether, in given cases, the services rendered are "like and contemporaneous," whether the respective traffic is of a "like kind," and whether the transportation is under "substantially similar circumstances and conditions."

The third section makes it "unlawful for any common carrier subject to the provisions of the act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, to any undue or unreasonable prejudice or disadvantage in any respect whatever." It also provides that every such common carrier shall afford "all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding and delivering of passengers and property to and from their respective lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines."

The fourth section makes it unlawful for any such common carrier to "charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within

the longer distance; but this shall not be construed as authorizing any common carrier to charge and receive as great compensation for a shorter as for a longer distance," and provision is likewise made that, " upon application to the Commission appointed under the provisions of this act, such common carrier may, in special cases, after investigation by the Commission, be authorized to charge less for longer than for shorter distances for the transportation of passengers or property;" and that "the Commission may from time to time prescribe the extent to which such designated common carrier may be relieved from the operation of this section of the act."

The powers of the Interstate Commission are not very clearly defined in the act, nor is its method of procedure very distinctly outlined. It is, however, declared in the 12th section, as amended March 2, 1889, and February 10, 1891, that the Commission "shall have authority to inquire into the management of the business of all common carriers subject to the provisions of the act, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created; and the Commission is hereby authorized and required to execute and enforce the provisions of the act." It is also made the duty of any district attorney of the United States to whom the Commission may apply to institute in the proper court, and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of the act and for the punishment of all violations thereof. And provision is made for complaints to be made by any person, firm, corporation, association or any mercantile, agricultural or manufacturing society, or any body politic or municipal organization, before the Commission; and for an investigation of such c plaints to be made by the Commission; and it is made the duty of the Commission to make reports in writing in respect thereof, which shall include the findings of fact upon which the conclusions of the Commission are based, together with

its recommendation as to what reparation, if any, should be made by any common carrier to any party or parties who may be found to have been injured; and such findings so made shall thereafter in all judicial proceedings be deemed *prima facie* evidence as to each and any fact found.

In the present case no complaint seems to have been made before the Commission by any person, firm, company or other organization against the Texas and Pacific Railway Company, of any disregard by said company of any provision of the statute resulting in any specific loss or damage to any one, nor has the Commission, in its findings, disclosed any such loss or damage to any individual complainant. And it is made one of the contentions of the defendant company that the entire proceeding was outside of the sphere of action appointed by the act to the Commission, which only had power as claimed by defendant, to inquire into complaint made by some person or body injured by some described act of the defendant company.

The complaint in the present case was made by certain corporations of New York, Philadelphia and San Francisco, known as Boards of Trade, or Chambers of Commerce, which appear to be composed of merchants and traders in those cities, engaged in the business of reaching and supplying the consumers of the United States with imported luxuries, necessities, and manufactured goods generally, and as active competitors with the merchants at Boston, Montreal, Philadelphia, New Orleans, San Francisco, Chicago and merchants in foreign countries who import direct on through bills of lading issued abroad.

We shall assume, in the disposition of the present case, that a valid complaint may be made before the Commission, by such trade organizations, based on a mode or manner of treating import traffic by a defendant company, without disclosing or containing charges of specific acts of discrimination or undue preference, resulting in loss or damage to individual persons, corporations, or associations.

We do not wish to be understood as implying that it would be competent for the Commission, without a complaint made

before it, and without a hearing, to subject common carriers to penalties. It is also obvious that if the Commission does have the power, of its own motion, to promulgate general decrees or orders which thereby become rules of action to common carriers, such exercise of power must be confined to the obvious purposes and directions of the statute. Congress has not seen fit to grant legislative powers to the Commission.

With these provisions of the act and these general principles in mind, we now come to consider the case in hand.

After an investigation made by the Commission on a complaint against the Texas and Pacific Railway Company and other companies by the boards of trade above mentioned, the result reached was the order of the Commission made on January 29, 1891, a disregard of which was complained of by the Commission in its bill or petition filed in the Circuit Court of the United States.

The Texas and Pacific Railway Company, a corporation created by laws of the United States, and also possessed of certain grants from the State of Texas, owns a railroad extending from the city of New Orleans, through the State of Texas, to El Paso, where it connects with the railroad of the Southern Pacific Company, the two roads forming a through route to San Francisco. The Texas and Pacific Railway Company has likewise connections with other railroads and steamers, forming through freight lines to Memphis, St. Louis and other points on the Missouri River, and elsewhere.

The defendant company admitted that, as a scheme or mode of obtaining foreign traffic, it had agencies by which, and by the use of through bills of lading, it secured shipments of merchandise from Liverpool and London, and other European ports, to San Francisco and to the other inland points named. It alleged that, in order to get this traffic, it was necessary to give through rates from the places of shipment to the places of final destination, and that, in fixing said rates, it was controlled by an ocean competition by sailing and steam vessels by way of the Isthmus and around the Horn, and also,

to some extent, by a competition through the Canada route to the Pacific coast. These rates, so fixed and controlled, left to the defendant company and to the Southern Pacific Company, as their share of the charges made and collected, less than the local charges of said companies in transporting similar merchandise from New Orleans to San Francisco, and so, too, as to foreign merchandise carried to other inland points. The defendant further alleged that unless it used said means to get such traffic the merchandise to the Pacific coast would, none of it, reach New Orleans, but would go by the other means of transportation; that neither the community of New Orleans nor any merchant or shipper thereof was injured or made complaint — that the traffic thus secured was remunerative to the railway company and was obviously beneficial to the consumers at the places of destination, who were thus enabled to get their goods at lower rates than would prevail if this custom of through rates was destroyed.

As we have already stated, the Commission did not charge or find that the local rates charged by the defendant company were unreasonable, nor did they find that any complaint was made by the city of New Orleans, or by any person or organization there doing business. Much less did they find that any complaint was made by the localities to which this traffic was carried, or that any cause for such complaint existed.

The Commission justified its action wholly upon the construction put by it on the act to regulate commerce, as forbidding the Commission to consider the "circumstances and conditions" attendant upon the foreign traffic as such "circumstances and conditions" as they are directed in the act to consider. The Commission thought it was constrained by the act to regard foreign and domestic traffic as like kinds of traffic under substantially similar circumstances and conditions, and that the action of the defendant company in procuring through traffic that would, except for the through rates, not reach the port of New Orleans, and in taking its *pro rata* share of such rates, was an act of "unjust discrimination," within the meaning of the act.

In so construing the act we think the Commission erred.

As we have already said, it could not be supposed that Congress, in regulating commerce, would intend to forbid or destroy an existing branch of commerce, of value to the common carriers and to the consumers within the United States. Clearly, express language must be used in the act to justify such a supposition.

So far from finding such language, we read the act in question to direct the Commission, when asked to find a common carrier guilty of a disregard of the act, to take into consideration all the facts of the given case — among which are to be considered the welfare and advantage of the common carrier, and of the great body of the citizens of the United States who constitute the consumers and recipients of the merchandise carried; and that the attention of the Commission is not to be confined to the advantage of shippers and merchants who deal at or near the ports of the United States, in articles of domestic production. Undoubtedly the latter are likewise entitled to be considered; but we cannot concede that the Commission is shut up by the terms of this act to solely regard the complaints of one class of the community. We think that Congress has here pointed out that, in considering questions of this sort, the Commission is not only to consider the wishes and interests of the shippers and merchants of large cities, but to consider also the desire and advantage of the carriers in securing special forms of traffic, and the interest of the public that the carriers should secure that traffic, rather than abandon it, or not attempt to secure it. It is self-evident that many cases may and do arise where, although the object of the carriers is to secure the traffic for their own purposes and upon their own lines, yet, nevertheless, the very fact that they seek, by the charges they make, to secure it, operates in the interests of the public.

Moreover, it must not be overlooked that this legislation is experimental. Even in construing the terms of a statute, courts must take notice of the history of legislation, and, out of different possible constructions, select and apply the one that best comports with the genius of our institutions and, therefore, most likely to have been the construction intended

by the law-making power. Commerce, in its largest sense, must be deemed to be one of the most important subjects of legislation, and an intention to promote and facilitate it, and not to hamper or destroy it, is naturally to be attributed to Congress. The very terms of the statute, that charges must be *reasonable*, that discrimination must not be *unjust*, and that preference or advantage to any particular person, firm, corporation or locality must not be *undue* or *unreasonable*, necessarily imply that strict uniformity is not to be enforced; but that all circumstances and conditions which reasonable men would regard as affecting the welfare of the carrying companies, and of the producers, shippers and consumers, should be considered by a tribunal appointed to carry into effect and enforce the provisions of the act.

The principal purpose of the second section is to prevent unjust discrimination between shippers. It implies that, in deciding whether differences in charges, in given cases, were or were not unjust, there must be a consideration of the several questions whether the services rendered were "like and contemporaneous," whether the kinds of traffic were "like," whether the transportation was effected under "substantially similar circumstances and conditions." To answer such questions, in any case coming before the Commission, requires an investigation into the facts; and we think that Congress must have intended that whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered in forming a judgment whether such differences were or were not "unjust." Some charges might be unjust to shippers — others might be unjust to the carriers. The rights and interests of both must, under the terms of the act, be regarded by the Commission.

The third section forbids any undue or unreasonable preference or advantage in favor of any person, company, firm, corporation or locality; and as there is nothing in the act which defines what shall be held to be due or undue, reasonable or unreasonable, such questions are questions not of law, but of fact. The mere circumstance that there is, in a given

case, a preference or an advantage does not of itself show that such preference or advantage is undue or unreasonable within the meaning of the act. Hence it follows that before the Commission can adjudge a common carrier to have acted unlawfully, it must ascertain the facts; and here again we think it evident that those facts and matters which carriers, apart from any question arising under the statute, would treat as calling, in given cases, for a preference or advantage, are facts and matters which must be considered by the Commission in forming its judgment whether such preference or advantage is undue or unreasonable. When the section says that no locality shall be subjected to any undue or unreasonable prejudice or disadvantage in any respect whatsoever, it does not mean that the Commission is to regard only the welfare of the locality or community where the traffic originates, or where the goods are shipped on the cars. The welfare of the locality to which the goods are sent is also, under the terms and spirit of the act, to enter into the question.

The same observations are applicable to the fourth section, or the so-called long and short haul provision, and it is unnecessary to repeat them.

The only argument, urged in favor of the view of the Commission, that is drawn from the language of the statute, is found in those provisions of the statute that make it obligatory on the common carriers to publish their rates, and to file with the Commission copies of joint tariffs of rates or charges over continuous lines or routes operated by more than one common carrier; and it is said that the place at which it would seem that joint rates should be published for the information of shippers would be at the place of origin of the freight, and that this cannot be done, or be compelled to be done, in foreign ports.

The force of this contention is not perceived. Room is left for the application of these provisions to traffic originating within the limits of the United States, even if, for any reason, they are not practically applicable to traffic originating elsewhere. Nor does it appear that the Commission may not compel all common carriers within the reach of their jurisdic-

tion to publish such rates, and to furnish the Commission with all statements or reports prescribed by the statute.  Nor was there any allegation, evidence or finding, in the present case, that the Texas and Pacific Railway Company has failed to file with the Commission copies of its joint tariffs, showing the joint rates from English ports to San Francisco, nor that the company has failed to make public such joint rates in such manner as the Commission may have directed.

Another position taken by the Commission in its report, and defended in the briefs of counsel, is, that it is the duty of the Commission to so construe the act to regulate commerce as to make it practically coöperate with what is assumed to be the policy of the tariff laws.  This view is thus stated in the report:

" One paramount purpose of the act to regulate commerce, manifest in all its provisions, is to give to all dealers and shippers the same rates for similar services rendered by the carrier in transporting similar freight over its line.  Now, it is apparent from the evidence in this case, that many American manufacturers, dealers and localities, in almost every line of manufacture and business, are the competitors of foreign manufacturers, dealers and localities, for supplying the wants of American consumers at interior places in the United States, and that under domestic bills of lading they seek to require from American carriers like service as their foreign competitors in order to place their manufactured goods, property and merchandise with interior consumers.  The act to regulate commerce secures them this right.  To deprive them of it by any course of transportation business or device is to violate the statute." 4 Interstate Com. Com. Rep. 514, 515.

Our reading of the act does not disclose any purpose or intention, on the part of Congress, to thereby reinforce the provisions of the tariff laws.  These laws differ wholly in their objects from the law to regulate commerce.  Their main purpose is to collect revenues with which to meet the expenditures of the government, and those of their provisions, whereby Congress seeks to so adjust rates as to protect American manufacturers and producers from competition by foreign low-priced labor, operate equally in all parts of the country.

The effort of the Commission, by a rigid general order, to deprive the inland consumers of the advantage of through rates, and to thus give an advantage to the traders and manufacturers of the large sea board cities, seems to create the very mischief which it was one of the objects of the act to remedy.

Similar legislation by the Parliament of England may render it profitable to examine some of the decisions of the courts of that country construing its provisions.

In fact, the second section of our act was modelled upon section 90 of the English "Railway Clauses Consolidation Act" of 1845, known as the "Equality Clause," and the third section of our act was modelled upon the second section of the English "act for the better regulation of the traffic on railways and canals" of July 10, 1854, and the eleventh section of the act of July 21, 1873, entitled "An Act to make better provision for the carrying into effect the Railway and Canal Traffic Act, 1854, and for other purposes connected therewith."

One of the first cases that arose under the act of 1854 was that of *Hozier* v. *The Caledonian Railway*, 1 Nev. & Mac. Railway Cases, 27; *S. C.* 17 Sess. Cas. 302; 24 Law Times, 339; where Hozier filed a petition against the railway company, alleging that he was aggrieved by being charged nine shillings for travelling between Motherwell and Edinburgh, a distance of forty-three miles, while passengers travelling in the same train and in the class of carriage between Glasgow and Edinburgh were charged only two shillings, which was alleged to amount to an undue and unreasonable preference. But the petition was dismissed, and the court, by Lord Curriehill, said: "The only case stated in the petition is that passengers passing from Glasgow to Edinburgh are carried at a cheaper aggregate rate than passengers from Motherwell to either of these places. Now that is an advantage, no doubt, to those passengers travelling between Edinburgh and Glasgow. But is it an *unfair* advantage over other passengers travelling between intermediate stations? The complainer must satisfy us that there is something *unfair* or *unreasonable* in what he complains of, in order to warrant any interference. Now, I have read the statement in the petition and I have listened to

the argument in support of it to find what there is *unreasonable* in giving that advantage to through passengers. What disadvantage do Motherwell passengers suffer by this? I think that no answer was given to this, except that there was none. This petitioner's complaint may be likened to that of the laborer who, having worked all day, complained that others who had worked less received a penny like himself."

The case of *Foreman* v. *Great Eastern Railway Co.*, 2 Nev. & Mac. 202, was decided by the English Railway Commissioners in 1875. The facts were that the complainants imported coal, in their own ships, from points in the North of England to Great Yarmouth, and forwarded the coal to various stations on the defendants' railway, between Great Yarmouth and Peterborough. The complaint was that the defendants' rates for carrying coal from Yarmouth to stations in the interior, at which complainants dealt, were unreasonably greater than the rates charged in the opposite direction, from Peterborough to such stations; and that such difference in rates was made by the defendants for the purpose of favoring the carriage of coal from the interior as against coal brought to Yarmouth by sea, and carried thence into the interior over the defendants' railway. The Commissioners found that it was true that the defendants did carry coal from the interior to London, Yarmouth and other seaports on their line, at exceptionally low rates, but that this was done for the purpose of meeting the competition existing at those places. It appeared that the rate from Peterborough to Thetford, 51 miles, was 4 shillings, while the rate from Peterborough to Yarmouth, 100 miles, was only 3 shillings. The Commissioners said: "As, however, the complainants do not, as far as their trade in Yarmouth itself is concerned, use the Great Eastern Railway at all, the company cannot be said to prefer other traffic to theirs; nor does the Traffic Act prevent a railway company from having special rates of charge to a terminus to which traffic can be carried by other routes or other modes of carriage with which theirs is in competition."

In *Harris* v. *Cockermouth Railway*, 1 Nev. & Mac. 97; *S. C.* 3 C. B. (N. S.) 693, the court held it to be an undue preference

for a railway company to concede to the owner of a colliery a
lower rate than to the owners of other collieries, from the
same point of departure to the same point of arrival, merely
because the person favored had threatened to build a rail-
way for his coal, and to divert his traffic from defendant's
railway. But Chief Justice Cockburn said: "I quite agree
that this court has intimated, if not absolutely decided, that a
company is entitled to take into consideration any circum-
stances, either of a general or of a local character, in considering
the rate of charge which they will impose upon any particular
traffic.  .  .  .  As, for instance, in respect of terminal traffic,
there might be competition with another railway; and in re-
spect to terminal traffic as distinguished from intermediate
traffic, it might well be that they could afford to carry goods
over the whole line cheaper, or proportionately so, than they
could over an intermediate part of the line."

In the case of *Budd* v. *London & Northwestern Railway
Co.*, 4 Eng. Ry. and Canal Traffic Cases, 393, and in *London
& Northwestern Railway* v. *Evershed*, 3 App. Cas. 1029, it
was held that it was not competent for the railway company
to make discriminations between persons shipping from the
same point of departure to the same point of arrival, but, even
in those cases, it was conceded that there might be circum-
stances of competition which might be considered. At any
rate, those cases have been much modified, if not fully over-
ruled by the later cases — particularly in *Denaby Main Col-
liery Company* v. *Manchester, Sheffield & Lincolnshire Railway
Co.*, 11 App. Cas. 97, and in *Phipps* v. *London & Northwest-
ern Railway*, 2 Q. B. D., 1892, 229, 236.

The latter was the case of an application under the Rail-
way and Canal Traffic acts for an order enjoining the defend-
ants to desist from giving an undue preference to the owners
of Butlins and Islip furnaces, and from subjecting the traffic
of the complainants to an undue preference, in the matter of
the rates charged for the conveyance of coal, coke and pig-
iron traffic; and also for an order enjoining the defendants
to desist from giving an unreasonable preference or advan-
tage to the owners of Butlins and Islip furnaces and the

traffic therefrom, by making an allowance of four pence per ton in respect of coal, coke and pig-iron conveyed for them by the defendants. The sidings of the Duston furnaces, belonging to the complainants, were situated on the London and Northwestern Railway, at a distance of about sixty miles from Great Bridge, one of the pig-iron markets to the westward. The sidings of the Butlins and Islip furnaces were situated on the same railway to the east of the Duston furnaces, and a distance from the pig-iron market as to Butlins, of about seventy-one miles, and as to Islip of about eighty-two miles. Duston had only access to the London and Northwestern, but Butlins and Islip had access not only to the London and Northwestern, but also to the Midland Railway. The London & Northwestern Company, which carried the Butlins pig-iron eleven miles further and the Islip pig-iron twenty-two miles further than the Duston pig-iron, charged Butlins 0.95$d$. per mile, and Islip 0.84$d$. per mile, while they charged Duston 1.05$d$. per mile, so that the total charge per ton of pig-iron from Duston to the western markets was five shillings two pence, while the total charge per ton from either Butlins or Islip was five shillings eight pence.

When the case was before the Railway Commissioners, it was said by Wills, J.: "It is complained that, although along the London and Northwestern Railway every ton of pig-iron, every ton of coal, and every ton of coke travels a longer distance in order to reach Islip than in order to reach the applicant's premises, the charge that is put upon it, although greater than the charge which is put upon the traffic which goes to the applicant's premises, is not sufficiently greater to represent the increased distance. . . . I first observe that these are, in my judgment, eminently practical questions, and if this court once attempts the hopeless task of dealing with questions of this kind with any approach to mathematical accuracy, and tries to introduce a precision which is unattainable in commercial and practical matters, it would do infinite mischief and no good. . . . It seems to me that we must take into account the fact that at Butlins and Islip there is an effective competition with the Midland. Although effec-

tive competition with another railway company or canal company will not of itself justify a preference, which is otherwise quite beyond the mark, yet still it is not a circumstance that can be thrown out of the question, and I think there is abundance of authority for that. It follows also, I think, from the view which I am disposed to take of these, being eminently practical questions, that you must give due consideration to the commercial necessities of the companies as a matter to be thrown in along with the others. . . . I wish emphatically to be considered as not having attempted to lay down any principles with regard to this question of undue preference, or as to the grounds upon which I have decided it. In my judgment, undue preference is a question of fact in each case."

The Railway Commissioners refused to interfere, and the case was appealed. Lord Herschell stated the case and said:

" This application is made under the second section of the Railway and Canal Traffic act, 1854, which provides that 'no railway company shall make or give any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatever, nor shall any such company subject any particular person or company, or particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatever.'

"The question, therefore, which the tribunal, whether it be the court or the Commissioners, before whom such a question comes, has to determine is, whether an undue preference or advantage is being given, or whether the one party is being unduly prejudiced or put to a disadvantage as compared with the other. I think it is clear that the section implies that there may be a preference, and that it does not make every inequality of charge an undue preference.

" Of course, if the circumstances so differ that the difference of charge is in exact conformity with the difference of circumstances, there would be no preference at all. But, as has been pointed out before, what the section provides is that there shall not be an undue or unreasonable preference or

prejudice.   And it cannot be doubted that whether in particu-
lar instances there has been an undue or unreasonable preju-
dice or preference is a question of fact.   In *Palmer* v. *London
& Southwestern Railway Co.* (L. R. 1 C. P. 593), Chief Jus-
tice Erle said : 'I beg to say that the argument from author-
ity seems to me to be without conclusive force in guiding
the exercise of this jurisdiction ; the question whether undue
prejudice has been caused being a question of fact depend-
ing on the matters proved in each case.'

"In *Denaby Main Colliery Company* v. *Manchester, &c.,
Railway Co.*, 3 Railway and Canal Traffic Cases, 426, when
it was before the Court of Appeals, on an appeal arising
out of the proceedings before the Railway Commissioners,
Lord Selborne, then Lord Chancellor, said : 'The defendants
gave a decided, distinct and great advantage, as it appears to
me, to the distant collieries.   That may be due or undue,
reasonable or unreasonable, but, under these · circumstances,
is not the reasonableness a question of fact ?   Is it not a ques-
tion of fact and not of law whether such a preference is due
or undue ?   Unless you can point to some other law which
defines what shall be held to be reasonable or unreasonable, it
must be and is a mere question not of law but of fact.'

"The Lord Chancellor there points out that the mere cir-
cumstance that there is an advantage does not of itself show
that it is an undue preference within the meaning of the act,
and further, that whether there' be such undue preference or
advantage, is a question of fact, and of fact .alone of the act
of 1854.   No rule is given to guide the court or the tribunal
in the determination of cases or applications made under
this second section.   The conclusion is one of fact to be ar-
rived at, looking at the matter broadly and applying common
sense to the facts that are proved.   I quite agree with· Mr.
Justice Wills that it is impossible to exercise a jurisdiction,
such as is conferred by this section, by any process of mere
mathematical or arithmetical calculation.·   When you have a
variety of circumstances differing in the one case from the
other, you cannot say. that a difference of circumstances
represents or is equivalent to such a fraction of a penny dif-

ference of charge in the one case as compared with the other. A much broader view must be taken, and it would be hopeless to attempt to decide a case by any attempted calculation. I should say that the decision must be arrived at broadly and fairly, by looking at all the circumstances of the case, that is, looking at all the. circumstances which are proper to be looked at; because, of course, the very question in this case is whether a particular circumstance ought or ought not to be considered; but keeping in view all the circumstances which may legitimately be taken into consideration, then it becomes a mere question of fact. . . . Now, there is no doubt that in coming to their determination the court below did have regard to competition between the Midland and the North-western, and the situation of these two furnaces which rendered such competition inevitable. If the appellants can make out that, in point of law, that is a consideration which cannot be permitted to have any influence at all, that those circumstances must be rigidly excluded from consideration, and that they are not circumstances legitimately to be considered, no doubt they establish that the court below has erred in point of law. But it is necessary for them to go as far as that in order to make any way with this appeal, because once admit that to any extent, for any purpose, the question of competition can be allowed to enter in, whether the court has given too much weight to it or too little, becomes a question of fact and not of law. The point is undoubtedly a very important one. . . .

" As I have already observed, the second section of the act of 1854 does not afford to the tribunal any kind of guide as to what is undue or unreasonable. It is left entirely to the judgment of the court on a review of the circumstances. Can we say that the local situation of one trader, as compared with another, which enables him by having two competing routes to enforce upon the carrier by either of these routes a certain amount of compliance with his demands, which would be impossible if he did not enjoy that advantage, is not among the circumstances which may be taken into consideration? I am looking at the question now as between trader and trader.

It is said that it is unfair to the trader who is nearer the market that he should not enjoy the full benefit of the advantage to be derived from his geographical situation at a point on the railway nearer the market than his fellow-trader who trades at a point more distant; but I cannot see, looking at the matter as between the two traders, why the advantageous position of the one trader in having his works so placed that he has two competitive routes is not as much a circumstance to be taken into consideration as the geographical position of the other trader, who, though he has not the advantage of competition, is situated at a point on the line geographically nearer the market. Why the local situation in regard to its proximity to the market is to be the only consideration to be taken into account in dealing with the matter as a matter of what is reasonable and right as between the two traders, I cannot understand.

"Of course, if you are to exclude this from consideration altogether, the result must inevitably be to deprive the trader who has the two competing routes of a certain amount of the advantages which he derives from that favorable position of his works. All that I have to say is that I cannot find anything in the act which indicates that when you are left at large, for you are left at large, as to whether as between two traders the company is showing an undue and unreasonable preference to the one as compared with the other, you are to leave out that circumstance any more than any other circumstance which would affect men's minds. . . . One class of cases, unquestionably intended to be covered by the section, is that in which traffic from a distance, of a character that competes with the traffic nearer the market, is charged low rates, because unless such low rates were charged, it would not come into the market at all. It is certain, unless some such principle as that were adopted, a large town would necessarily have its food supply greatly raised in price. So that, although the object of the company is simply to get the traffic, the public have an interest in their getting the traffic and allowing the carriage at a rate which will render that traffic possible, and so bring the goods at a cheaper rate, and one which makes it

possible for those at a greater distance to compete with those situate nearer to it. . . . I cannot but think that a lower rate which is charged from a more distant point by reason of a competing route which exists thence is one of the cases which may be taken into account under those provisions, and which would fall within the terms of the enactment.

"Suppose that to insist on absolutely equal rates would practically exclude one of the two railways from the traffic, it is obvious that these members of the public who are in the neighborhood where they can have the benefit of this competition, would be prejudiced by any such proceedings. And further, inasmuch as competition undoubtedly tends to diminution of charges, and the charge of carriage is one which ultimately falls upon the consumer, it is obvious that the public have an interest in the proceedings under this act of Parliament not being so used as to destroy a traffic which can never be secured but by some such reduction of charge, and the destruction of which would be prejudicial to the public by tending to increase prices."

The learned judge then proceeded to discuss the authorities, and pointed out that the case of *Budd* v. *London & Northwestern Railway Co.*, and *Evershed's case*, are no longer law, so far as the second section of the act of 1854 is concerned.

Lindley and Kay, Lord Justices, gave concurring opinions, and the conclusion of the court was that the Commissioners did not err in taking into consideration the fact that there was a competing line together with all the other facts of the case, and in holding that a preference or advantage thence arising was not undue or unreasonable.

The precise question now before us has never been decided in the American cases, but there are several in which somewhat analogous questions have been considered.

*Atchison, Topeka & Santa Fé Railroad* v. *Denver & New Orleans Railroad*, 110 U. S. 667, was a case arising under a provision of the constitution of the State of Colorado which declares "that all individuals, associations and corporations shall have equal rights to have persons and property transported over any railroad in this State, and no undue or unrea-

sonable discrimination shall be made in charges or facilities for transportation of freight or passengers within the State, and no railroad company shall give any preference to individuals, associations or corporations in furnishing cars or motive power." This court held that under this constitutional provision a railroad company which had made provisions with a connecting road for the transaction of joint business at an established union junction was not required to make similar provisions with a rival connecting line at another near point on its line, and that the constitutional provision is not violated by refusing to give to a connecting road the same arrangement as to through rates which are given to another connecting line, unless the conditions as to the service are substantially alike in both cases.

The sixth section of the act of Congress of July 1, 1862, relative to the Union Pacific Railroad Company provided that the government shall at all times have the preference in the use of the railroad " at fair and reasonable rates of compensation, not to exceed the amount paid by private parties for the same kind of service." In the case of *Union Pacific Railway* v. *United States*, 117 U. S. 355, it was, in effect, held that the service rendered by a railway company in transporting local passengers from one point on its line to another is not identical with the service rendered in transporting through passengers over the same rails.

A petition was filed before the Interstate Commerce Commission by the Pittsburgh, Cincinnati and St. Louis Railway Company against the Baltimore and Ohio Railroad Company, seeking to compel the latter company to withdraw from its lines of road, upon which business competition with that of the petitioner was transacted, the so called " party rates," and to decline to give such rates in the future — also for an order requiring said company to discontinue the practice of selling excursion tickets at less than the regular rate. The cause was heard before the Commission, which held the so called party rate tickets, in so far as they were sold for lower rates for each member of a party of ten or more than rates contemporaneously charged for the transportation of single

passengers between the same points, constituted unjust discrimination and were therefore illegal. The defendant company refusing to obey the mandate of the Commission, the latter filed a bill in the Circuit Court of the United States for the Southern District of Ohio, asking that the defendant be enjoined from continuing in its violation of the order of the Commission. The Circuit Court dismissed the bill. Some of the observations made by Jackson, Circuit Judge, may well be cited. 43 Fed. Rep. 37: "Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue prejudice or disadvantage persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits. Conceding the same terms of contract to all persons equally, may not the carrier adopt both wholesale and retail rates for its transportation service?" Again: "The English cases establish the rule that, in passing upon the question of undue or unreasonable preference or disadvantage, it is not only legitimate, but proper, to take into consideration, besides the mere differences in charges, various elements, such as the convenience of the public, the fair interests of the carrier, the relative quantities or volume of the traffic involved, the relative cost of the services and profit to the company, and the situation and circumstances of the respective customers with reference to each other as competitive or otherwise."

The case was brought to this court and the judgment of the Circuit Court dismissing the bill was affirmed. *Interstate Commerce Commission* v. *Baltimore & Ohio Railroad*, 145 U. S. 263. The court, through Mr. Justice Brown, cited with approval passages from the opinion of Judge Jackson in the court below, and among other things said: "It is not all dis-

criminations or preferences that fall within the inhibition of the statute; only such as are unjust and unreasonable."

Again, speaking of the sale of a ticket for a number of passengers at a less rate than for a single passenger, it was said: " It does not operate to the prejudice of the single passenger, who cannot be said to be injured by the fact that another is able, in a particular instance, to travel at a less rate than he. If it operates injuriously to any one it is to the rival road, which has not adopted corresponding rates, but, as before observed, it was not the design of the act to stifle competition, nor is there any legal injustice in one person procuring a particular service cheaper than another. . . . If these tickets were withdrawn the defendant road would lose a large amount of travel, and the single-trip passenger would gain absolutely nothing."

The conclusions that we draw from the history and language of the act, and from the decisions of our own and the English courts, are mainly these: That the purpose of the act is to promote and facilitate commerce by the adoption of regulations to make charges for transportation just and reasonable, and to forbid undue and unreasonable preferences or discriminations: That, in passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the Commission or the courts, is empowered to fully consider all the circumstances and conditions that reasonably apply to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests as well of the carrying companies as of the traders and shippers, and in considering whether any particular locality is subjected to an undue preference or disadvantage the welfare of the communities occupying the localities where the goods are delivered is to be considered as well as that of the communities which are in the locality of the place of shipment: That among the circumstances and conditions to be considered, as well in the case of traffic originating in foreign ports as in the case of traffic originating within the limits of the United States, competition that affects rates should be considered, and in deciding whether rates and charges made at

a low rate to secure foreign freights which would otherwise go by other competitive routes are or are not undue and unjust, the fair interests of the carrier companies and the welfare of the community which is to receive and consume the commodities are to be considered : That if the Commission, instead of confining its action to redressing, on complaint made by some particular person, firm, corporation or locality, some specific disregard by common carriers of provisions of the act, proposes to promulgate general orders, which thereby become rules of action to the carrying companies, the spirit and letter of the act require that such orders should have in view the purpose of promoting and facilitating commerce, and the welfare of all to be affected, as well the carriers as the traders and consumers of the country.

It may be said that it would be impossible for the Commission to frame a general order if it were necessary to enter upon so wide a field of investigation, and if all interests that are liable to be affected were to be considered. This criticism, if well founded, would go to show that such orders are instances of general legislation, requiring an exercise of the law-making power, and that the general orders made by the Commission in March, 1889, and January, 1891, instead of being regulations calculated to promote commerce and enforce the express provisions of the act, are themselves laws of wide import, destroying some branches of commerce that have long existed, and undertaking to change the laws and customs of transportation in the promotion of what is supposed to be public policy.

This is manifest from the facts furnished us in the report and findings of the Commission, attached as an exhibit to the bill filed in the Circuit Court.

It is stated in that report that the Illinois Central Railroad Company, one of the respondents in the proceeding before the Commission, averred in its answer that it was constrained, by its obedience to the order of March, 1889, to decline to take for shipment any import traffic, and, to its great detriment, to refrain from the business, for the reason that to meet the action of the competing lines it would have to make a less rate on the import than on the domestic traffic.

Upon this disclosure that their order had resulted in depriving that company of a valuable part of its traffic (to say nothing of its necessary effect in increasing the charges to be finally paid by the consumers), the Commission in its report naively remarks: "This lets the Illinois Central Railway Company out." 4 Interstate Com. Com. Rep. 458.

We also learn from the same source that there was competent evidence adduced before the Commission, on the part of the Pennsylvania Railroad Company, that since that company, in obedience to the order of March, 1889, has charged the full inland rate on the import traffic, the road's business in that particular has considerably fallen off — that the steamship lines have never assented to the road's charging its full inland rates, and have been making demands on the road for a proper division of the through rate — that if it were definitely determined that the road was not at liberty to charge less than the full inland rate, the result would be that it would effectually close every steamship line sailing to and from Baltimore and Philadelphia.

The Commission did not find it necessary to consider this evidence, because the Pennsylvania Railroad Company was before it in the attitude of having obeyed the order.

We do not refer to these matters for the purpose of indicating what conclusions ought to have been reached by the Commission or by the courts below in respect to what were proper rates to be charged by the Texas and Pacific Railway Company. That was a question of fact, and if the inquiry had been conducted on a proper basis we should not have felt inclined to review conclusions so reached. But we mention them to show that there manifestly was error in excluding facts and circumstances that ought to have been considered, and that this error arose out of a misconception of the purpose and meaning of the act.

The Circuit Court held that the order of January 29, 1891, was a lawful order, and enjoined the defendant company from carrying any article of import traffic shipped from any foreign port through any port of entry in the United States, or any port of entry in a foreign country adjacent to the United

States, upon through bills of lading, and destined to any place within the United States, upon any other than the published inland tariff covering the transportation of other freight of like kind over its line from such port of entry to such place of destination, or from charging or accepting for its share of through rates upon imported traffic a lower sum than it charges or receives for domestic traffic of like kind to the same destination from the point at which the imported traffic enters the country.

In treating the facts of the case the court says : " It must be conceded as true, for the purposes of the present case, that the rates for the transportation of traffic from Liverpool and London to San Francisco are, in effect, fixed and controlled by the competition of sailing vessels between these ports, and also by the competition of steamships and sailing vessels in connection with railroads across the Isthmus of Panama, none of which are in any respect subject to the act to regulate commerce. It must also be conceded that the favorable rates given to the foreign traffic are, for reasons to which it is now unnecessary to revert, somewhat remunerative to the defendant; and it must also be conceded that the defendant would lose the foreign traffic, by reason of the competition referred to, and the revenue derived therefrom, unless it carries at the lower rates, and by so doing is enabled to get part of it, which would otherwise go from London and Liverpool to San Francisco around the Horn or by the way of the Isthmus." *Interstate Commerce Commission* v. *Texas & Pacific Railway*, 52 Fed. Rep. 187.

The Circuit Court did not discuss the case at length, either as to its law or facts, but, in effect, approved the order of January 29, 1891, as valid, and enjoined the defendant company from disregarding it.

The Circuit Court of Appeals seems to have disapproved of the construction put on the act by the Commission. The language of the court was as follows: " The Commission contended that the defendant had violated the second section of the act to regulate commerce, which prohibits unjust discrimination in the compensation charged for like and contempo-

raneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, and had also violated the third section, which prohibits any undue or unreasonable preference or advantage to any particular description of traffic. The defendant insisted that the dis-similar conditions growing out of the ocean competition freed its conduct from the prohibition of the statute. The Commission held that this class of dissimilar conditions was not in the contemplation of the statute, and was not to be regarded in the regulation of inland tariffs of rates." Then, after citing a passage from the report of the Commission, the court proceeds to say : " Its conclusion was that foreign and home merchandise ' under the operation of the statute, when handled and transferred by interstate carriers engaged in carriage in the United States, stand exactly upon the same basis of equality as to tolls, charges, and treatment for similar services rendered.' This rule, having been founded upon a construction of the statute, is a very broad one. It is applicable to all the foreign circumstances and conditions which affect rates, and the question whether it must be universally applied without regard to any circumstances which may exist in a foreign country, and whether dissimilarities which have a foreign origin are to be excluded from consideration under the operation of the statute, is an exceedingly important one, the ultimate decision of which may have a wider influence upon the interstate commerce of the country than we can foresee. This legal question was not discussed in the export rate case, which was treated ' as one of practical policy.' We are not disposed to pass authoritatively upon this question, except in a case which demands it, and in which the effect of this construction of the statute is naturally the subject of discussion." 20 U. S. App. 6–9.

Having thus intimated its dissent from, or, at least, its distrust of, the view of the Commission, the court proceeded to affirm the decree of the Circuit Court and the validity of the order of the Commission, upon the ground that, even if ocean competition should be regarded as creating a dissimilar condition, yet that, in the present case, the disparity in rates was too great to be justified by that condition.

This course proceeded, we think, upon an erroneous view of the position of the case. That question was not presented to the consideration of the court. There was no allegation in the Commission's bill or petition that the inland rates charged by the defendant company were unreasonable. That issue was not presented. The defendant company was not called upon to make any allegation on the subject. No testimony was adduced by either party on such an issue. What the Commission complained of was that the defendant refused to recognize the lawfulness of its order; and what the defendant asserted, by way of defence, was that the order was invalid, because the Commission had avowedly declined to consider certain "circumstances and conditions" which, under a proper construction of the act, it ought to have considered.

If the Circuit Court of Appeals was of opinion that the Commission in making its order had misconceived the extent of its powers, and if the Circuit Court had erred in affirming the validity of an order made under such misconception. the duty of the Circuit Court of Appeals was to reverse the decree, set aside the order, and remand the cause to the Commission, in order that it might, if it saw fit, proceed therein according to law. The defendant was entitled to have its defence considered, in the first instance at least, by the Commission upon a full consideration of all the circumstances and conditions upon which a legitimate order could be founded. The questions whether certain charges were reasonable or otherwise, whether certain discriminations were due or undue, were questions of fact, to be passed upon by the Commission in the light of all facts duly alleged and supported by competent evidence, and it did not comport with the true scheme of the statute that the Circuit Court of Appeals should undertake, of its own motion, to find and pass upon such questions of fact, in a case in the position in which the present one was.

We do not, of course, mean to imply that the Commission may not directly institute proceedings in a Circuit Court of the United States charging a common carrier with disregard of provisions of the act, and that thus it may become the duty

of the court to try the case in the first instance.   Nor can it
be denied that, even when a petition is filed by the Commis-
sion for the purpose of enforcing an order of its own, the court
is authorized to "hear and determine the matter as a court of
equity," which necessarily implies that the court is not con-
cluded by the findings or conclusions of the Commission; yet
as the act provides that, on such hearing, the findings of fact
in the report of said Commission shall be *prima facie* evidence
of the matters therein stated, we think it plain that if, in such
a case, the Commission has failed in its proceedings to give
notice to the alleged offender, or has unduly restricted its
inquiries upon a mistaken view of the law, the court ought
not to accept the findings of the Commission as a legal basis
for its own action, but should either inquire into the facts on
its own account, or send the case back to the Commission to
be lawfully proceeded in.

The mere fact that the disparity between the through and
the local rates was considerable did not, of itself, warrant the
court in finding that such disparity constituted an undue dis-
crimination — much less did it justify the court in finding
that the entire difference between the two rates was undue
or unreasonable, especially as there was no person, firm, or
corporation complaining that he or they had been aggrieved
by such disparity.

*The decree of the Circuit Court of Appeals is reversed; the*
*decree of the Circuit Court is also reversed; and the cause is*
*remanded to that court, with directions to dismiss the bill.*

MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE
BROWN, dissenting.

The Interstate Commerce Act, as amended March 2, 1889,
requires every common carrier, subject to its provisions, to
print and keep open to public inspection schedules showing its
rates and charges for the transportation of passengers and
property.   It also requires that such schedules "shall plainly
state the places upon its railroad between which property and
passengers will be carried, and shall contain the classification
of freight in force;" further, that any common carrier subject

to the provisions of the act, " receiving freight in the United States to be carried through a foreign country to any place in the United States shall also in like manner print and keep open to public inspection, at every depot or office where such freight is received for shipment, schedules showing the through rates established and charged by such common carrier to all points in the United States beyond the foreign country to which it accepts freight for shipment."

The act contains no provision for printed schedules to be kept open to public inspection, of freight shipped from a foreign country, not adjacent to this country, on a through bill of lading, and to be carried, after it reaches an American port, to some place in the United States. I think the reason for this is that Congress did not intend that the rates to be charged for service by carriers subject to the provisions of the Interstate Commerce Act should depend upon or be affected by rates established abroad for ocean transportation.

The Commission, thus interpreting the act of Congress, and in order that American interests might not be injuriously affected by freight arrangements made by railroad companies with companies engaged in ocean transportation and which were not subject to our laws, issued on the 23d day of March, 1889, the following general order : " Imported traffic transported to any place in the United States from a port of entry or place of reception, whether in this country or in an adjacent foreign country, is required to be taken on the inland tariff covering other freights."

Subsequently, November 29, 1889, proceedings were commenced before the Commission by the petition of the New York Board of Trade and Transportation against the Pennsylvania Railroad Company, the Pittsburgh, Fort Wayne and Chicago Railroad Company and the Pittsburgh, Cincinnati and St. Louis Railroad Company.

The petition charged that those companies violated the Interstate Commerce Act and were guilty of unjust discriminations, in that they charged their regular tariff rates upon property delivered to them at New York and Philadelphia for transportation to Chicago and other Western points, while

charging rates much lower for a like cotemporaneous service under substantially similar circumstances and conditions when the property was or is delivered to them at New York or Philadelphia by vessels and steamship lines, under through bills of lading from foreign ports and foreign interior ports, issued under common arrangement between the defendants and such vessels and steamship lines and foreign railroads for continuous carriage at joint rates from the point or port of shipment to Chicago and other Western points; the defendants' share of such through rate for the inland transportation being lower than its regular tariff rates, in some cases as low as fifty per cent thereof.

The petition further charged that the defendants failed to state in their published tariffs or in such through bills of lading the inland charge separately from the ocean and other charges in order to prevent ascertainment of the actual inland rates; that they made and gave undue and unreasonable preferences and advantages to persons, firms, companies, corporations and localities interested in the transportation of imported traffic from the seaboard under such through bills of lading, and had subjected persons, companies, firms and corporations, in and about some localities to undue and unreasonable prejudice and disadvantage by reason of the higher rates charged to them for like and contemporaneous service under substantially similar circumstances and conditions; that there are no conditions or circumstances relating to the transportation of imported traffic which justify any difference in rates between imported traffic transported to any place in the United States from a port of entry and other traffic from such ports, and that the inland published tariff must by law be the same for all such freights.

In the course of the proceedings different Commercial Exchanges and Chambers of Commerce became co-plaintiffs, and other railroads were made defendants.

It appears from the opinion of the Interstate Commerce Commission that numerous roads conformed to the order of March 23, 1889, and insisted that their inland rates were the same for all traffic, whether domestic or imported.

In the progress of the proceedings the Texas and Pacific Railway Company was brought before that tribunal; and on the 29th day of January, 1891, an order was made that certain railroad companies, including the Texas and Pacific Railway Company, should wholly cease and desist from carrying any article of import traffic shipped from any foreign port through any port of entry of the United States, or any port of entry in a foreign country adjacent to the United States, upon through bills of lading, and destined to any place within the United States, upon any other than the published inland tariff covering the transportation of other freight of like kind over their respective lines from such port of entry to such place of destination, or at any other than the same rates established in said published inland tariff for the carriage of other like kind of traffic in the elements of bulk, weight, value and expense of carriage.

The present case was commenced by the Interstate Commerce Commission by petition filed in the Circuit Court of the United States for the Southern District of New York against the Texas and Pacific Railway Company.

A decree was entered by that court, enjoining the latter company, its board of directors, officers, agents, attorneys, clerks, servants, employés and all persons claiming or holding under them, or either, or any of them, from carrying any article of import traffic shipped from any foreign port through any port of entry in the United States, or any port of entry in a foreign country adjacent to the United States, upon through bills of lading, and destined to any place within the United States, upon any other than the published inland tariff covering the transportation of other freight of like kind over its line from such port of entry to such place of destination; or at any other than the same rates established in said published tariff for the carriage of other like kinds of traffic in the elements of bulk, weight, value and expense of carriage; or from carrying imported traffic at lower rates for like service than the defendant charges for like traffic originating in the United States; or from charging or accepting for its share of through rates upon imported traffic a lower sum than it

charges or receives for domestic traffic of like kind to the same destination from the point at which the imported traffic enters the country; or for such share of through rates upon imported traffic any other than the rates established in the defendant's published tariff for the carriage of other like kind of traffic in the elements of bulk, weight, value, distances and expense of carriage.

This decree was affirmed in the Court of Appeals for the Second Circuit.

The record shows that the rate in cents per one hundred pounds charged for the transportation, on through bills of lading, of books, buttons, carpets, clothing and hosiery, from Liverpool and London, via New Orleans, over the Texas and Pacific Railway and the railroads of the Southern Pacific system, to San Francisco, is 107, while upon the same kind of articles — carried, it may be, *on the same train* — the rate charged from New Orleans, *over the same railroads*, to San Francisco, is 288. The rate in cents per one hundred pounds charged for the transportation, on through bills of lading, of boots and shoes, cashmeres, cigars, confectionery, cutlery, gloves, hats and caps, laces, linen, linen goods, saddlers' goods and woollen goods, from Liverpool and London, via New Orleans, over the same railroad, to San Francisco, is 107, while upon like goods, starting from New Orleans and destined for San Francisco, over the same line — it may be, *on the same train* — the rate charged is 370. Discrimination, in the matter of rates, is also made by the railway company (though not to so great an extent) in favor of blacking, burlaps, candles, cement, chinaware, cordage, crockery, common drugs, earthenware, common glassware, glycerine, hardware, leather, nails, soap, caustic soda, tallow, tin plate and wood pulp, manufactured abroad and shipped, on through bills of lading, from Liverpool and London, via New Orleans, to San Francisco, and against goods of like kind carried from New Orleans to San Francisco over the same railroads.

These rates have been established by agreement between the railway company whose line, with its connections, extends from New Orleans to San Francisco, and the companies whose

vessels run from Liverpool to New Orleans. And the question is presented, whether the Texas and Pacific Railway Company can, consistently with the act of Congress, charge a higher rate for the transportation of goods starting from New Orleans and destined to San Francisco, than for the transportation between the same places, of goods of the same kind in all the elements of bulk, weight, value and expense of carriage, brought to New Orleans from Liverpool on a through bill of lading, and to be carried to San Francisco. If this question be answered in the affirmative; if all the railroad companies whose lines extend inland from the Atlantic and Pacific seaboards indulge in like practices — and if one may do so, all may and will do so; if such discrimination by American railways, having arrangements with foreign companies, against goods, the product of American skill, enterprise and labor, is consistent with the act of Congress, then the title of that act should have been one to regulate commerce to the injury of American interests and for the benefit of foreign manufacturers and dealers.

The railway company insists that the competition existing between it and the ocean lines running between Liverpool and San Francisco, via Cape Horn and the Pacific Ocean, and between Liverpool and San Francisco, via the Isthmus of Panama, compel it to charge a higher rate from New Orleans to San Francisco for the transportation of goods originating at New Orleans than on like goods originating at Liverpool and destined to San Francisco, via New Orleans; otherwise, it contends, goods that originate at Liverpool would fall into the hands of its competitors in the business of transportation. The Interstate Commerce Commission held that, in determining the question before it, no weight could be attached to the circumstances arising from the conduct of ocean lines by corporations or associations who were in no wise subject to the provisions of the act of Congress; and that the provision which expressly forbids common carriers from making or giving undue preferences or advantages in any respect whatsoever was intended to be so far rigid in its nature that it could not be relaxed by reason of circumstances or condi-

tions arising out of or connected with foreign countries or that were caused by agencies beyond the control or supervision of the Commission.  The court now holds that the Commission erred in thus interpreting the act of Congress.

To what common carriers does the Interstate Commerce Act of 1887 apply?   24 Stat. 379, c. 104; 25 Stat. 855, c. 382. This question is answered by the first section of that act.

By that section, the provisions of the act are declared to "apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management or arrangement, for a continuous carriage or shipment, from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country: *Provided, however,* That the provisions of this act shall not apply to the transportation of passengers or property, or to the receiving, delivering, storage or handling of property, wholly within one State, and not shipped to or from a foreign country from or to any State or Territory as aforesaid."   Again: "All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

From this section it is clear that the Texas and Pacific Railway Company is, and that the ocean lines connected with that company are not, subject to the provisions of the act.

This interpretation is supported by the declaration made on the floor of the Senate by the chairman of the select committee which reported the original bill. He said : "While the provisions of the bill are made to apply mainly to the regulation of interstate commerce, in order to regulate such commerce fairly and effectively, it has been deemed necessary to extend its application also to certain classes of foreign commerce which are intimately intermingled with interstate commerce, such as shipments between the United States and *adjacent* countries by railroad, and the transportation by railroad of shipments between points in the United States and ports of transshipment or of entry, when such shipments are destined to or received from a foreign country on through bills of lading. To avoid any uncertainty as to the meaning of these provisions in regard to what may be at the same time, in some instances, state and foreign commerce, it is expressly provided that the bill shall not apply to the transportation of property wholly within the State *and* not destined to *or received from* a foreign country."

We have then an explicit declaration by Congress that the act not only embraces common carriers of the class to which the Texas and Pacific Railway Company belongs, but that its provisions as to rates apply to the transportation of property "shipped from a foreign country to any place in the United States, *and* carried to such place *from a port of entry either in the United States or an adjacent foreign country.*"

What is the rule declared by Congress in respect to rates for the transportation of property or goods of the kind just described ? It is clearly defined by the second, third and fourth sections, which declare :

"SEC. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him

or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

" Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. . . .

" Sec. 4. That it shall be unlawful for any common carrier subject to the provisions of this act to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line, in the same direction, the shorter being included within the longer distance; but this shall not be construed as authorizing any common carrier within the terms of this act to charge and receive as great compensation for a shorter as for a longer distance: *Provided, however,* That upon application to the Commission appointed under the provisions of this act, such common carrier may, in special cases, after investigation by the Commission, be authorized to charge less for longer than for shorter distances for the transportation of passengers or property; and the Commission may from time to time prescribe the extent to which designated common carriers may be relieved from the operation of this section of this act."

I am unable to find in these sections any authority for the Commission, or for a carrier subject to the provisions of the act of Congress, to take into consideration the rates established by ocean lines as affecting the charges that an American carrier may make for the transportation of property over its routes. The transportation, for instance, by the Texas and

Pacific Railway Company of boots and shoes from New Orleans to San Francisco for A, and the transportation of like goods over the same route for B, is "a like and contemporaneous service" by the carrier for each shipper, and is performed under precisely the same circumstances and conditions. A discrimination between A and B, in respect of charges for a like and contemporaneous service in transporting the same kind of property, over the same route, is an unjust discrimination, because it necessarily operates to give that one to whom the most liberal rates are given, an undue or unreasonable preference or advantage over the others.

I am unwilling to impute to Congress the purpose to permit a railroad company, because of arrangements it may make, for its benefit, with foreign companies engaged in ocean transportation, to charge for transporting from one point to another point in this country goods of a particular kind manufactured in this country three or four times more than it charges for carrying, over the same route and between the same points, goods of the same kind manufactured abroad and received by such railroad company at one of our ports of entry.

The fourth section of the statute relating to long and short distances, and which authorizes the Commission, in special cases, to allow less to be charged for longer than for shorter distances for the transportation of passengers or property over the same route, does not refer to distances covered and services performed on the ocean, between this country and foreign countries not adjacent to this country, nor to transportation between the same points in this country over the same road. When the question is as to rates for service by a carrier between two given points in this country, and in reference to the same kind of property, Congress, I think, intended that for such "like and contemporaneous service," performed, as they necessarily are, under the same circumstances and conditions, no preference or advantage should be given to any particular person, company, firm, corporation or locality. Consequently, when goods are to be carried from one point in the United States to another, the rate to be

charged cannot properly be affected by an inquiry as to where such goods originated or were manufactured.

Congress intended that all property, transported by a carrier subject to the provisions of the act, should be carried without any discrimination because of its origin. The rule intended to be established was one of equality in charges, as between a carrier and all shippers, in respect of like and contemporaneous service performed by the carrier over *its* line, between the same points, without discrimination based upon conditions and circumstances arising out of that carrier's relations with other carriers or companies, especially those who cannot be controlled by the laws of the United States.

After referring to the fact that goods originating in a foreign country are carried upon rates that are practically fixed abroad, and are not published here, while carriers governed by the act of Congress are required to publish their rates for transportation in this country, the Commission, speaking by Commissioner Bragg, well said : " Imported foreign merchandise has all the benefit and advantage of rates thus made in the foreign ports ; it also has all the benefit and advantage of the low rates made in the ocean carriage arising from the peculiar circumstances and conditions under which it is done ; but when it reaches a port of entry of the United States, or a port of entry of a foreign country adjacent to the United States, in either event upon a through bill of lading, destined to a place in the United States, then its carriage from such port of entry to its place of destination in the United States, under the operation of the act to regulate commerce, must be under the inland tariff from such port of entry to such place of destination covering other like kind of traffic in the elements of bulk, weight, value and of carriage, and no unjust preferences must be given to it in carriage or facilities of carriage over other freight. In such case all the circumstances and conditions that have surrounded its rates and carriage from the foreign port to the port of entry have had their full weight and operation, and in its carriage from a port of entry to the place of its destination in the United States, the mere fact that it is foreign merchandise thus brought from a foreign

port is not a circumstance or condition under the operation of the act to regulate commerce, which entitles it to lower rates or any other preference in facilities and carriage over home merchandise or other traffic of a like kind carried by the inland carrier from the port of entry to the place of destination in the United States for the same distance and over the same line." I concur entirely with the Commission when it further declared : " One paramount purpose of the act to regulate commerce, manifest in all its provisions, is to give to all dealers and shippers the same rates for similar services rendered by the carrier in transporting similar freight over its line. Now, it is apparent from the evidence in this case that many American manufacturers, dealers and localities, in almost every line of manufacture and business, are the competitors of foreign manufacturers, dealers and localities for supplying the wants of American consumers at interior places in the United States, and that under domestic bills of lading they seek to require from American carriers like service as their foreign competitors in order to place their manufactured goods, property and merchandise with interior consumers. The act to regulate commerce secures them this right. To deprive them of it by any course of transportation business or device is to violate the statute. Such a deprivation would be so obviously unjust as to shock the general sense of justice of all the people of the country, except the few who would receive the immediate and direct benefit of it."

It seems to me that any other interpretation of the act of Congress puts it in the power of railroad companies which have established, or may establish, business arrangements with foreign companies engaged in ocean transportation, to do the grossest injustice to American interests. I find it impossible to believe that Congress intended that freight, originating in Europe or Asia and transported by an American railway from an American port to another part of the United States, could be given advantages in the matter of rates, for services performed in this country, which are denied to like freight originating in this country and passing over the same line of railroad between the same points. To say that Con-

gress so intended is to say that its purpose was to subordinate American interests to the interests of foreign countries and foreign corporations. Such a result will necessarily follow from any interpretation of the act that enables a railroad company to exact greater compensation for the transportation from an American port of entry, of merchandise originating in this country, than is exacted for the transportation over the same route of exactly the same kind of merchandise brought to that port from Europe or Asia, on a through bill of lading, under an arrangement with an ocean transportation company. Under such an interpretation, the rule established by Congress to secure the public against unjust discrimination by carriers subject to the provisions of the Interstate Commerce Act would be displaced by a rule practically established in foreign countries by foreign companies, acting in combination with American railroad corporations seeking, as might well be expected, to increase their profits, regardless of the interests of the public or of individuals.

I am not much impressed by the anxiety which the railroad company professes to have for the interests of the consumers of foreign goods and products brought to this country under an arrangement as to rates made by it with ocean transportation lines. We are dealing in this case only with a question of rates for the transportation of goods from New Orleans to San Francisco over the defendant's railroad. The consumers at San Francisco, or those who may be supplied from that city, have no concern whether the goods reach them by way of railroad from New Orleans, or by water around Cape Horn, or by the route across the Isthmus of Panama.

Nor is the question before the court controlled by considerations arising out of the tariff enactments of Congress. The question is one of unjust discrimination by an American railway against shippers and owners of goods and merchandise originating in this country, and of favoritism to shippers and owners of goods and merchandise originating in foreign countries. If the position of the Texas and Pacific Railway Company be sustained, then all the railroads of the country that extend inland from either the Atlantic or the Pacific Ocean

will follow their example, with the inevitable result that the goods and products of foreign countries, because alone of their foreign origin and the low rates of ocean transportation, will be transported inland from the points where they reach this country at rates so much lower than is accorded to American goods and products, that the owners of foreign goods and products may control the markets of this country to the serious detriment of vast interests that have grown up here, and in the protection of which, against unjust discrimination, all of our people are deeply concerned.

It is said that only Boards of Trade or Commercial Exchanges have complained of the favorable rates allowed by railroad companies for foreign freight. It seems to me that this is an immaterial circumstance. So long as the questions under consideration were properly raised by those Boards and Exchanges, it was unnecessary that individual shippers, producers and dealers should intervene in the proceedings before the Commission. But, I may ask whether the interests represented by these Boards of Trade and Commercial Exchanges are not entitled to as much consideration as the interests of railroad corporations? Are all the interests represented by those who handle, manufacture and deal in American goods and merchandise that go into the markets of this country to be subordinated to the necessities or greed of railroad corporations? As I have already said, Congress, by enacting the Interstate Commerce Act, did not seek to favor any special class of persons, nor any particular kind of goods because of their origin. It intended that all freight of like kind, wherever originating, should be carried between the same points, in this country, on terms of equality.

It is said that the Interstate Commerce Commission is entitled to take into consideration the interests of the carrier. My view is, that the act of Congress prescribes a rule which precludes the Commission or the courts from taking into consideration any facts outside of the inquiry whether the carrier, for like and contemporaneous services, performed in this country under substantially similar circumstances and conditions, may charge one shipper more or less than he charges

another shipper of like goods, over the same route, and between the same points. Undoubtedly, the carrier is entitled to reasonable compensation for the service it performs. But the necessity that a named carrier shall secure a particular kind of business is not a sufficient reason for permitting it to discriminate unjustly against American shippers, by denying to them advantages granted to foreign shippers. Congress has not legislated upon such a theory. It has not said that the inquiry, whether the carrier has been guilty of unjust discrimination, shall depend upon the financial necessities of the carrier. On the contrary, its purpose was to correct the evils that had arisen from unjust discrimination made by carriers engaged in interstate commerce. It has not, I think, declared, nor can I suppose it will ever distinctly declare, that an American railway company, in order to secure for itself a particular business and realize a profit therefrom, may burden interstate commerce in articles originating in this country, by imposing higher rates for the transportation of such articles from one point to another point in the United States, than it charges for the transportation between the same points, under the same circumstances and conditions, of like articles originating in Europe, and received by such company on a through bill of lading issued abroad. Does any one suppose that, if the Interstate Commerce bill, as originally presented, had declared, in express terms, that an American railroad company might charge more for the transportation of American freight, between two given places in this country, than it charged for foreign freight, between the same points, that a single legislator would have sanctioned it by his vote? Does any one suppose that an American President would have approved such legislation?

Suppose the Interstate Commerce bill, as originally reported, or when put upon its passage, had contained this clause: "Provided, however, the carrier may charge less for transporting from an American port to any place in the United States, freight received by it from Europe on a through bill of lading, than it charges for American freight carried from that port to the same place for which the foreign freight is

destined." No one would expect such a bill to pass an American Congress. If not, we should declare that Congress ever intended to produce such a result; especially, when the act it has passed does not absolutely require it to be so interpreted.

Let us suppose the case of two lots of freight being at New Orleans, both destined for San Francisco over the Texas and Pacific Railway and its connecting lines. One lot consists of goods manufactured in this country; the other, of goods of like kind manufactured in Europe, and which came from Europe on a through bill of lading. Let us suppose, also, the case of two passengers being at New Orleans — the act of Congress applies equally to passengers and freight — both destined for San Francisco over the same railroad and its connecting lines. One is an American; the other, a foreigner who came from Europe upon an ocean steamer belonging to a foreign company that had an arrangement with the Texas and Pacific Railway Company, by which a passenger, with a through ticket from Liverpool, would be charged less for transportation from New Orleans to San Francisco than it charged an American going from New Orleans to San Francisco. The contention of the railroad company is, that it may carry European freight and passengers, between two given points in this country, at lower rates than it exacts for carrying American freight and passengers between the same points, and yet not violate the statute, which declares it to be unjust discrimination for any carrier, directly or indirectly, by any device, to charge, demand, collect or receive from any person or persons a greater *or* less compensation for any service rendered, or to be rendered, in the transportation of passengers or property than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions. And that discrimination is justified upon the ground that, otherwise, the railroad company will lose a particular traffic. Under existing legislation, such an interpretation of the act of Congress enables the great railroad corporations of this country to place American travellers, in their own

country, as well as American interests of incalculable value, at the mercy of foreign capital and foreign combinations — a result never contemplated by the legislative branch of the government.

I cannot accept this view, and, therefore, dissent from the opinion and judgment of the court.

I am authorized by MR. JUSTICE BROWN to say that he concurs in this opinion.

MR. CHIEF JUSTICE FULLER dissenting :

In my judgment the second and third sections of the Interstate Commerce Act are rigid rules of action, binding the Commission as well as the railway companies. The similar circumstances and conditions referred to in the act are those under which the traffic of the railways is conducted, and the competitive conditions which may be taken into consideration by the Commission are the competitive conditions within the field occupied by the carrier, and not competitive conditions arising wholly outside of it.

I am, therefore, constrained to dissent from the opinion and judgment of the court.