POTLATCH LUMBER CO. et al. v. SPOKANE FALLS & N. RY. CO. et al.

(Circuit Court, E. D. Washington, E. D.    December 24, 1907.)

No. 1,303.

COMMERCE—CARRIERS—INTERSTATE COMMERCE—POWER OF COURT TO ENJOIN ENFORCEMENT OF SCHEDULE RATES.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], as amended, including the amendatory act of June 29, 1906 (34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1907, p. 892]), a court of equity is without jurisdiction to enjoin a railroad company from charging the rates fixed by its schedule of rates duly published and filed with the Interstate Commerce Commission, and which has gone into effect, pending a proceeding before the commission to determine its lawfulness.

H. M. Stephens, for complainants.
John P. Hartman, Albert Allen, M. J. Gordon, and E. J. Cannon, for defendants.

WHITSON, District Judge. Complainants, engaged in the manufacture and interstate traffic of lumber and forest products, are corporations organized under the laws of several states, including Washington, and the defendants, interstate and intrastate common carriers engaged in interstate commerce by traffic connections with interstate carriers, are corporations also, and in that regard they present the same diversity of citizenship. Relief is sought by bill in equity against the enforcement of certain recently increased rates for the shipment of timber products from this district to eastern points beyond state limits. The grounds upon which complainants base their right to equitable interposition, as set forth in the bill, are that the defendants have arbitrarily, and by confederation and conspiracy, agreed to establish and fix unreasonable and unjust rates upon interstate commerce from points within the state of Washington, and especially within the territory coextensive with the territorial jurisdiction of this court, to states other than the state of Washington; that the defendant railway companies, in connection with other participating carriers, have filed with the Interstate Commerce Commission, and have published, a re-

vised tariff of rates, effective November 1, 1907, being I. C. C. No. 850, on lumber and other forest products from the state of Washington and other northwestern points of origin to eastern and southeastern destinations in other states, whereby the theretofore existing rates on forest products were advanced from 3 to 12½ cents per 100 pounds, which rates, it is alleged, are arbitrary, unreasonable, and unjust, and will be unlawfully and wrongfully collected and extorted from the complainants and all shippers of interstate freight covered by said tariffs; that this combination and conspiracy is in violation of the acts of Congress commonly known as the "Sherman Anti-Trust Act," and the acts amendatory thereof. It is alleged that the interests controlling the competing lines have combined and parceled out the territory, and that said increased rate is in suppression of competition, for the mutual advantage of the carriers, and in violation of the acts of Congress; that while the tariffs generally speaking, on other commodities, have been reduced steadily for many years, and are still maintained at greatly reduced rates from those formerly charged, that it is now proposed to arbitrarily increase them on lumber and forest products by virtue of said collusive, unlawful, and discriminatory agreement. It is charged that the local lines participate in the increase in proportion to the mileage or distance of haul upon the respective roads as compared to the distance and haul by other connecting carriers, and that neither a court of law nor the Interstate Commerce Commission has jurisdiction to grant any reparation or afford any relief in the premises until after the threatened irreparable injury shall have been accomplished. It was disclosed at the hearing that the matter was pending before the Interstate Commerce Commission in pursuance of its power to regulate rates, and the aid of the court is sought to enjoin the exaction of the rates thus filed with that body until a hearing can be had before it, and rates be fixed, and that thereafter, upon final hearing, a decree be granted in conformity to law and equity. The main trunk lines originally parties to the suit, to wit, the Northern Pacific Railway Company, the Great Northern Railway Company, the Chicago, Burlington & Quincy Railroad Company, the Union Pacific Railway Company, the Oregon Short Line Railroad Company, and the Oregon Railroad & Navigation Company, have been dismissed upon the motion of complainants, for the reason that they are parties to like suits instituted in the Western district of this state, and in the district of Oregon. And the defendants now remaining are, with the exception of the Canadian Pacific Railway Company, the Chicago, Milwaukee & St. Paul Railway Company, the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, and the Chicago & Northwestern Railway Company, local roads having traffic connections with the main trunk lines which have been dismissed, as well as with the lines last above mentioned. The increase in the rates over those formerly existing is set out in detail, from which it appears that there is a substantial advance in freight charges as set down in the traffic sheet hereinabove referred to.

The decisions of Judges Hanford and Wolverton granting injunctions at the suits of lumbermen of their respective districts were made prior to November 1st, and whatever be the merits of the contentions

there made it is manifest that a different question is presented here; but in the present state of the record it must be taken that the rates filed with the Interstate Commerce Commission, to become effective November 1st, are arbitrary, unreasonable, and exorbitant as alleged in the bill of complaint. It is unnecessary to consider the many questions, far reaching in their effect, which have been discussed upon the application for an injunction, but a summary of the legislation affecting the issue must be made for the purpose of ascertaining what rights may be enforced and what duties are required of the court in view of the facts, and the prayer for injunctive relief.

The most important provision appears in section 1, which reads:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

The foregoing appears in substantially the same form in Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], as in the amendatory act of June 29, 1906 (34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1907, p. 892]). Without undertaking to point out the specific amendments made by the latter act, it will be sufficient for present purposes to note such provisions now in force as are applicable to the inquiry to be made.

Every common carrier is required to file with the commission, print and keep open to public inspection, a schedule showing all the rates, fares, and charges for transportation between the different points on its own route, and between points on its own route and points on the route of any other carrier by railroad. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection the separately established rates, fares, and charges applied to through transportation. These schedules must be plainly printed in large type, and notices for the use of the public must be kept posted in two public and conspicuous places in every depot, station, or office of the carrier where passengers or freight are received, in such form that they shall be accessible and can be conveniently inspected. No change shall be made in the rates, fares, and charges which have been filed and published by any common carrier, except after 30 days' notice to the commission and to the public. No carrier, unless otherwise provided by the act, shall engage or participate in the transportation of passengers or property unless the rates, fares, and charges upon which the same are transported have been filed and published in accordance with the provisions of the act; and no common carrier may charge or demand, collect, or receive a greater or less or different compensation between the points named in such tariffs than the rates specified in the tariff filed and in effect at the time. The commission is authorized to hear complaints, and, if, after such hearing, it shall determine that any party complainant is entitled to an award of damages for a violation of the act, it shall make an order directing the carrier to pay the amount which it shall find due on or before a day to be named. If the carrier does not comply within the time limited, the complainant, or any person for whose benefit the order was made, may file in the Circuit Court for the district in which

he resides, or in which is located the principal operating office of the carrier, or through which the road of the carrier runs, a petition setting forth briefly the causes for which he claims damages, and the order of the commission in the premises, and thereupon the suit shall proceed in the Circuit Court in the manner pointed out by the act. If any carrier fails or neglects to obey any order of the commission other than for the payment of money, any party interested, or the commission in its own name, may apply to the Circuit Court in the district where such carrier has its principal office, or in which the violation shall have occurred, for an enforcement of the order. The venue is fixed and the method is pointed out whereby suits may be brought against the commission to enjoin, set aside, annul, or suspend any order or requirement by it made. No injunction or interlocutory decree suspending or restraining the enforcement of an order of the commission shall be granted except on a hearing after not less than five days' notice to the commission. The Circuit and District Courts of the United States are empowered upon the application of the Attorney General, at the request of the commission, alleging a failure to comply with or a violation of any of the provisions of the act to regulate commerce, or of any acts supplemental thereto or amendatory thereof, by any common carrier, to issue a writ or writs of mandamus on such common carrier to compel a compliance with the provisions of the act. Willful failure upon the part of any carrier to file and publish the tariffs as required, or to strictly observe the same until changed according to law, is declared to be a misdemeanor subject to fine. Whenever any carrier files with the commission a particular rate, or participates in any rates so filed or published, that rate as against such carrier shall be conclusively deemed to be the legal rate, and any departure therefrom shall be deemed to be an offense. Upon complaint the commission has power "to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged." When carriers fail to agree among themselves in relation to joint rates, the commission may, after hearing, prescribe "the just and reasonable proportion of such joint rate to be received by each carrier party thereto." The commission, upon complaint being made, after hearing, may establish through or joint rates, and prescribe the division of such rates. Complaints for the recovery of damages shall be filed with the commission within two years from the time the action accrues, and not after; and a petition for the enforcement of an order for the payment of money shall be filed in the Circuit Court within one year from the date of the order, and not after. Offenses are defined, and penalties and forfeitures prescribed, and it is made the duty of the various district attorneys, under the direction of the Attorney General, to prosecute for the recovery thereof.

Thus it will be seen how fully Congress has empowered the Interstate Commerce Commission to deal with the subject of traffic between the states. All through the laws which have been enacted runs the thought of original jurisdiction. That of the courts would appear to be in aid of the jurisdiction of the commission, or by way of enforcement of its orders, or denying them when confiscatory. And thus it is that in obedience to a popular and overwhelming demand, part of which

consisted in criticism of the courts for granting injunctions, that Congress has, pursuant to the power vested in it by the Constitution, taken control of the regulation of interstate carriers. It may be remarked that agitation is going on now for an amendment to the act of 1906, which shall prohibit carriers from making any change in existing rates without the consent of the commission. Such a provision would avoid the necessity of applications similar to the one at bar, but the agitation illustrates that this deficiency has been recognized. Federal legislation is, as are the statutes of the several states creating state commissions, based upon the impracticability of properly dealing with the subject in any other method than by an administrative board empowered to investigate and summarily dispose of complaints, as has been pointed out by the Supreme Court.

With this preliminary statement, we are to inquire, in view of the legislation which has been adverted to, whether a court may enjoin the enforcement of a rate filed with the commission after the time fixed for it to become effective under the law. The inquiry will be greatly simplified by the statement of certain well-settled principles, thereby relieving from the discussion of vital questions which might otherwise tend to distract and divert from the one issue to be resolved: First. Under legislation existing prior to 1906 the Interstate Commerce Commission was not vested with power to fix rates. Second. The courts were equally powerless in the premises. Third. The right to establish and regulate rates properly belongs to the legislative branch of the government, and the fixing of rates is a legislative act.

We have seen that the act of June 29, 1906, has supplied the deficiency in prior legislation, and it is now admitted on all hands that the Interstate Commerce Commission has the power to regulate rates; but that the commission is endowed with this power does not wholly dispose of the question. It must turn upon whether the courts may anticipate its action pending an investigation. It cannot be disputed that it was perfectly lawful for the defendant carriers to file their rates, even increased rates if those in force were too low, for the provision that rates shall be just and reasonable must apply to carrier and shipper alike. The act contemplates that carriers shall fix rates, because they are expressly forbidden to charge any other rate than those filed, or to make any charge until the rate shall have been filed. There is no provision made for supervisory control over the fixing of rates in the first instance, and the law not only contemplates their establishment by the carriers, but expressly authorizes it, and makes it incumbent, and enforces the duty upon them. When the tariff sheet has been filed, and 30 days have expired, the tariffs thus fixed, whether reasonable or unreasonable, just or unjust, become lawful pending revision by the commission, for there is no other method by which they may be arrived at under the law. The carrier being entitled to just compensation for services rendered, as well as is the shipper to receive like consideration, the rights of the parties in this regard are reciprocal. If, then, these carriers conceived that the rates were not commensurate with the service rendered, they sought the only remedy available under the law by filing with the commission a schedule of increased rates, and after the time limited by the law itself there can

be no logical contention that it did not become the established rate pursuant to and in accordance with the provisions of the statute. The initiative in this regard has always been, and in the nature of things in their practical operation must be, with the carrier. Congress has prescribed no departure in procedure in that respect. It has simply recognized a pre-existing condition which grows out of the necessities of traffic, and it is the only practical method which may form a basis upon which legitimate regulation may proceed. There is nothing new or strange about this. Texas Pacific Railway Co. v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940.

It has been the universal practice, I believe, under the state commissions, and it would appear to be necessary in all jurisdictions which undertake to deal with the subject other than by direct legislation. The carriers in this case, then, have complied with the provisions of the law. They have violated no statute, but rather pursued the remedy pointed out by it. What, then, must be the conclusion? That since the carriers must upon their own initiative fix rates which are deemed by them just and reasonable, and those rates when effective become lawful until revised by the commission, the court in undertaking to enjoin a rate now which is in force pursuant to the law would be invading the jurisdiction of the tribunal created expressly by Congress for the purpose of determining that matter. The distinction between a rate to be put into effect in the future, and an existing rate, was well appreciated by court and counsel when the applications for injunctions already referred to were being heard, for those cases were pressed with all possible diligence in order to secure injunctions prior to the 1st day of November; and it appears by the proceedings that the hearing was shortened by the judges on the evening of October 31st, and that the argument was continued until 9:30 of that night for the purpose of enabling the court to act prior to the time that the rates should go into effect, and this was upon the theory that, when the rates did in fact become operative, the court lost jurisdiction to interpose against their enforcement until the matter should receive the attention of the commission.

The following from the remarks made by Judge Hanford during the progress of the hearing will best illustrate his view:

"Before you begin, I wish to state that you have to face a condition. It is only about 38 hours until this new rate schedule will take effect without the injunction. Now, if the case is to be tried as it was yesterday, that is, an elaborate presentation of facts with cumulative testimony read in extenso—the law will go into effect while you are still here talking."

Mr. Teal, of complainants' counsel, in discussing the power of the court, said:

"It is simply a question as to whether a rate which is claimed and admitted to be extortionate should go into effect and not whether they should make a rate or not, because that has to go to the Interstate Commerce Commission, and this court could not do it."

And so Mr. Wimbish, of counsel for complainants, observed:

"The Interstate Commerce Commission has no power to question the unreasonableness of the rates, and to adjudge them unreasonable until they are put into effect. So that, if we have no right to go before the equity court and get

an injunction against the putting into effect of this new rate, we have no remedy at all because, as decided in the Cincinnati and New Orleans Case, in 162 U. S. 184, the Interstate Commerce Commission has no power to enjoin rates, from going into effect and adjudging them unreasonable."

The ground relied upon in those cases was that the statute provides that rates shall be just and reasonable, and that the attempt on the part of the carriers to put into operation a different schedule of rates than those which had theretofore been in force for many years, by the substitution of unjust, arbitrary, and discriminatory rates, was a threatened injury which courts might anticipate. But what was then threatened has become an accomplished fact. The rates are in effect, and it does not appear how the force of this situation can be overcome at the present time in this court.

The argument has been made, based upon the common-law principle, that since common carriers are compelled to fix and maintain reasonable rates, and that a shipper may recover any excess which may be exacted beyond that amount, that this common-law duty imposed upon the carrier authorizes the courts to enjoin arbitrary or unreasonable rates, and hence that the power to afford relief remains unless it has been divested by the legislation of Congress; that the remedy which common carriers seek, where the rate becomes confiscatory or unreasonably low, is at the hands of courts of equity, in reliance upon the constitutional provision that they cannot be deprived of property without due process of law, and that, therefore, no law can be made which will deprive them of just and reasonable rates; and that that question may ultimately only be solved in the courts of the country. From this proposition the reciprocal right is attempted to be drawn, based upon a like remedy to be granted to the shipper; the theory being that since Congress has not provided that, in turn, the courts may not interfere to prevent the raising of rates, and that, inasmuch as it existed prior to the legislation which sought to bring the matter under control, it exists yet; that the inherent right which the shipper has to reasonable rates is only a counterpart of the right of the carrier to have reasonable compensation for services rendered. It is said that the complainants are remediless for that their business will be broken up before the commission can act; that the lumber interests will generally suffer all over the Northwest before its complicated machinery can be brought into operation, and that to deprive the shipper of this right is to deprive him of that of which under similar conditions the carrier might justly and summarily complain. There are several answers to this somewhat forceful contention, but a discussion which did not admit the justness of it in the abstract would be wanting in frankness. If the power was reserved to the courts, pending the putting into effect of the new rates, to prevent a threatened injury, it may be assumed that, since the act of 1906 provides that they cannot go into effect for a period of 30 days, this enlargement of the time was for the purpose of giving shippers an opportunity to seek the aid of equity to prevent an injury which might become irreparable. Again, if the proposition be admitted that carriers have the right to fix rates subject to the supervision and control of the commission, an interference now would amount to the fixing of rates, the power to

do which the court is not possessed of. The bill seeks to enjoin the defendants from collecting the proposed advance in rates, or any thereof; and, if this action be taken, the court would be holding that the defendants are entitled to collect the old rate, which is reasonable, and not the new rate, which is unreasonable, and it would, while the matter is pending before the commission, fix as the rate which the defendants could charge the original rate which has now been fully superseded in pursuance of the provisions, and in strict compliance, so far as appears, with the requirements of law. The case does not present the parallel of those numerous decisions which hold that prohibiting an unjust rate is not necessarily fixing a rate. Reliance is had upon this provision:

"* * * And nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies. * * *"

This statute was in force when Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, was decided. With this provision in view, and prior to the time that the Interstate Commerce Commission had been empowered to regulate and fix rates, it was said in referring to the contention that the shipper had the right of action at common law for damages asserted to have been suffered by discrimination against such person:

"When the general scope of the act is enlightened by the consideration just stated, it becomes manifest that there is not only a relation, but an indissoluble unity between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibition against preferences and discrimination."

And the reason assigned by the court for this conclusion was that:

"* * * Unless the requirement of a uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow. * * *"

It was said:

"* * * For, if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of a shipper by a court and jury as unreasonable, without reference to prior action by the commission, * * * it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination. * * *"

The argument that the judgment of a court in such a case would give rise to a change of the schedule rate was met in this way:

"This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created which would arise from a recognition of the right asserted; for if, without previous action by the commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the commission, and with the duty, which the statute casts upon that body, of seeing to it that

the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction, and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal, which the act created, with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the commission in the premises. This must be, because, if the power existed in both courts and the commission to originally hear complaints on this subject, there might be a divergence between the action of the commission and the decision of a court. In other words, the established schedule might be found reasonable by the commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."

The contention here, therefore, would inevitably lead to the conclusion that the legislation upon the subject of interstate commerce, in so far as it undertakes to deprive shippers of the right to appeal in the first instance to the courts, instead of appealing to the commission, is unconstitutional, the same as it would be if it deprived the carrier of the constitutional right to invoke the aid of a court of equity to prevent the confiscation of its property by unreasonably low and nonremunerative rates. That suggestion has not been made, and, indeed, in view of the power of Congress to deal with the subject, it would appear to be untenable; at least it would not be proper for this court, in view of the many decisions upon the subject, to follow out now the argument thus made to its legitimate consequences, and thereby declare the act void in that respect. Where the argument fails is that it assumes that the right of the shipper as it existed at common law was not taken away by Congress. The Supreme Court having held otherwise, it becomes untenable upon that ground. Again, the argument, distinctly able as it is, involves a confusion of rights and remedies. The power of Congress to deal with interstate commerce once conceded, the manner by which rights may be asserted, and the methods by which the shipper, upon the one hand, and the carrier, upon the other, may seek those rights, have been defined by law, and it cannot be held that so long as a remedy is pointed out whereby they may be pursued that it deprives a shipper of a right, because he may not, in the first instance, appeal to a tribunal which best suits his convenience and his desires. It has been said that, if the commission should not grant the relief to which the shippers are entitled, under existing laws they would be without remedy, but the court will not, in view of the explicit provisions of the act of 1906, assume to say that the commission will not render to the shippers their due, and since the remedy pointed out is to first apply to the commission, at least until the commission does deny a right, the courts will not anticipate such an unlikely result as that suggested by counsel as possible.

The case of Southern Railway Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, is relied upon as an authority justifying the assumption of jurisdiction, notwithstanding the decision from which quotation has just been made; but, if that case be critically examined, it will be found that it is not in any way inconsistent with the former case, nor does it enlarge upon the doctrines there so plainly enunciated. The argument is based upon this statement, found on page 437 of 206 U. S., page 711 of 27 Sup. Ct. (51 L. Ed. 1124):

"In the case at bar, however, there are assignments of error based on the objections to the jurisdiction of the Circuit Court. These might present serious questions in view of our decision in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, upon a different record than that before us. We are not required to say, however, that because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates."

This language, standing alone, gives color to the contention; but that which immediately follows explains what was meant:

"The Circuit Court granted no relief prejudicial to appellants on the original bill. It sent the parties to the Interstate Commerce Commission, where, upon sufficient pleadings identical with those before the court, and upon testimony adduced upon the issues made, the decision was adverse to the appellants. This action of the commission, with its findings and conclusions, was presented to the Circuit Court, and it was upon these, in effect, the decree of the court was rendered. There was no demurrer to that petition, and the testimony taken before the commission was stipulated into the case, and the opinion of the court recites that, 'with equal meritorious purpose, counsel for the respective parties agreed that this would stand for and be the hearing for final decree in equity.' * * * It was certainly competent for the appellees to proceed in the Circuit Court under section 16 of the interstate commerce act (24 Stat. 384, c. 104 [U. S. Comp. St. 1901, p. 3165]), and to apply by petition to the Circuit Court, 'sitting in equity,' for the court to hear and determine the matter 'as a court of equity,' and issue an injunction 'or other proper process, mandatory or otherwise,' to enforce the order of the commission. We think that under the broad powers conferred upon the Circuit Court by section 16 and the direction there given to the court to proceed with efficiency, but without the formality of equity proceedings, 'but in such manner as to do justice in the premises,' and in view of the stipulation of the parties, recited in the decree of the court, the appellants are precluded from making the objection that the court did not have jurisdiction to entertain the petition and grant the relief prayed for and decreed."

But no jurisdictional question has been waived by defendants in this case; on the contrary, jurisdiction has been expressly challenged.

In view of these considerations, I find myself unable, at the present time, to grant the relief to which the complainants appear to be entitled according to the allegations of the bill, for the reason that the tribunal created for that purpose is now hearing the controversy. It has original jurisdiction, and it is proceeding by virtue of authority expressly conferred by Congress. The commission was possessed of the matter when this application was made, and, since the court cannot prevent a threatened injury, the decision of the commission will be awaited, but the cause will be retained and further proceedings stayed pending the hearing before it. When a conclusion has been reached

and an order made by it, unless cause be shown to the contrary, a decree will be entered in accordance with its findings. If either party is dissatisfied with the action of the commission, a hearing will be had, and the extent of the power vested in the court to set aside or revise any order which shall be made in favor of the complainants or of the defendants will be considered, and the cause will then take such course as the circumstances shall seem to demand.