Geaham, Judge,
concurring:
I concur in the conclusions reached in this case, but feel constrained to give my views in a manner somewhat differ *350 ent and fuller from that contained in the opinion of the court :
In May, June, and August, 191!, the United States, acting through the Quartermaster Corps of the War Department, made shipments of troops with their personal baggage and also a large quantity of company property, or baggage, sometimes termed army impedimenta. The record does not disclose in detail the different kinds or quantity of each articles of impedimenta embraced in the shipment, and only shows the number of carloads. However, it is apparently conceded by the parties that this impedimenta consisted, generally speaking, of what is usually in such movements, namely, tents, ambulances, wagons, caissons, munitions, cooking utensils, tools, bedding, and other articles of camp equipment particularly used by the military units of the Army.
Over the lines of the Wabash Railroad Company, as the initial carrier, and the plaintiff as the ultimate carrier, the transportation of these troops was arranged for in the usual way by the issuance of regular Government requisitions or orders by a quartermaster of the Army, whose duty it was to arrange and control the shipments. With each soldier was transported free his personal baggage to the amount of 150 pounds. The said army impedimenta was shipped as freight in a number of freight cars on regular Government bills of lading previously prepared by said quartermaster, and presented and signed by the initial carrier and delivered to the proper representative of the Government. The impedimenta was shipped in freight cars on said bills of lading so prepared, as was known to, and understood by, the representative of the Government at the time, and was in accordance with the practice and course of dealings between the railroads and the Government extending over many years. The service of transporting these troops to their respective destinations, in its ultimate stages, was performed by the plaintiff. Vouchers for the passenger fares of the troops and the freight charges for the impedimenta were duly prepared, presented, and paid by the proper representative of the Government, and the incident apparently closed. In June, 1918, almost a year after the performance of the said *351 service by the plaintiff, the Comptroller of the Treasury decided, in the case of another carrier, covering somewhat similar facts of service, that under its baggage tariff filed with the Interstate Commerce Commission, allowing a baggage car free for every 25 persons traveling together, army impedimenta should be carried free as baggage on the basis of a car for every 25 soldiers traveling together, and that a charge or payment for transporting said impedimenta as freight was unlawful. Thereafter, when the account of the said quartermaster who had paid the plaintiff for the aforesaid shipments of May, June, and August, 1917, of impedimenta, as freight, came before the Auditor of the War Department for examination the payments were disapproved in accordance with said ruling of the comptroller, and the account of' said quartermaster as to these payments suspended. The quartermaster thereupon demanded of the plaintiff the refund of the amount so paid which was refused. No action was then taken either by the Government or the quartermaster to recover from the plaintiff this amount. The matter remained for the time in this shape.
In December, 1918, the plaintiff furnished transportation for another shipment of troops and presented its vouchers for payment, there being no dispute as to the correctness of the items of charge therein. These vouchers on reaching the auditor were approved and allowed, but a deduction was made on account of the said former claimed overpayment for transporting the impedimenta in the first shipment as freight, as to which payment the said quartermaster’s accounts have been suspended.
The plaintiff appealed to the comptroller, who sustained the ruling of the auditor, who deducted that amount from the sum due the plaintiff for the last shipment. The amount so deducted was the same which the plaintiff had refused to refund to the said quartermaster, whose account had been suspended for paying the same. Thereupon the plaintiff brought this suit to recover the amount so withheld, the same being a part of its unpaid bill for the last service rendered by the transportation of December, 1918.
The Government’s defense is by way of confession and avoidance, and presents an offset or counterclaim based upon *352 its right to withhold an amount alleged to haye been overpaid on the first shipment, upon the ground that this amount was illegally paid the plaintiff as freight charges for the shipment of this army impedimenta. This counterclaim is in effect a cross suit by the Government in the nature of a reparation suit in this court to recover from the plaintiff railroad company the amount of an alleged overpayment. In other words, the real matter in dispute here does not grow out of the plaintiff’s claim per se, but out of the counterclaim or cross suit by the Government. The ground of recovery in this cross reparation suit involves the contention that the railroad company’s application of a baggage tariff was and is unreasonable and discriminatory, and relief is sought by asking this court to so decide and in doing so to apply this tariff by holding, through analogy and approximation, that army impedimenta is analogous to and approximates the paraphernalia of theatrical companies, dog shows, baseball teams, etc.,, and is covered by a special baggage tariff providing for a baggage car free where as many as 25 persons are traveling together. In other words, though the said baggage tariff does not specifically mention army impedimenta and does mention the paraphernalia of the aforesaid companies, and though no tariff in terms covering arm impedimenta as baggage is shown, this court is asked by analogy and approximation to apply the said special tariff to army impedimenta, and, in effect, thereby say that not to apply it would be unreasonable and discriminatory as to the defendant. It is plain that the defendant as plaintiff in an original proceeding could not have brought a suit in this court to determine the questions which it seeks to have determined by this cross suit. The jurisdiction of this court to hear and determine these questions will be discussed further on.
The tariffs hereinafter discussed and contained in Finding II were well known to the Government officials in the War Department having charge of the shipment of troops, and were in force prior to the execution of the contract of January 1,1917, hereinafter mentioned and discussed. Prior to the execution of said contract the Quartermaster General of the Army, under whose particular control shipments of the character involved here came, had given a departmental *353 construction to these tariffs in his dealings with the railroad companies in his publication, “ Manual for the Quartermaster Corps” (see Finding II), issued to quartermasters, which was published periodically and was in effect in December, 1916, just prior to and at the time of the execution of said contract, January 1, 1917. From this publication it clearly appears that army impedimenta, company, or public property under the departmental construction of these tariffs and in accord with its policy and practice, was to be loaded and shipped as freight and the bill of lading prepared, prior to the transportation of troops, by Government officers. Checkable baggage under this manual was to be separated from company property, and it was pointed out that check-able baggage was to be carried free and was not to be loaded in cars with property loaded as freight.
On January 1,1917, the Government entered into a forma] written contract with the different railroad associations of the country, known as the Interterritorial Military Arrangement (Finding Y), to which the plaintiff was a party. This contract in tentative form, as a matter of precaution, was submitted by the Quartermaster General of the Army to the Comptroller of the Treasury for examination and suggestion before it was finally executed. The comptroller after examining the contract in a lengthy letter strongly approved of it and went into details to show the advantages in the way of economy which would accrue to the Government in particular, as well as the mutual benefit, to both parties thereto. He summed up his conclusions as follows:
“ This agreement is considered advantageous to the Government for the following reasons:
“ (a) It will result in a saving of Government funds.
“(6) It will procure cooperation oh the part of the railroads.
“ (e) It will facilitate the settlement of accounts.”
This contract provided, inter alia, that the fares applicable under it should be “lawful commercial fares on file with the Interstate Commerce Commission from starting point to destination at the time of movement * * * less land-grant deductions properly established, less 5 per cent." It will be seen that this gives the Government the advantage *354 of 5 per cent reduction over the general public, which is a consideration going not only to the matter of passenger transportation, but also to the provisions, of the contract relative to the transportation of baggage and other materials, and makes the contract controlling as to rates and charges on army impedimenta, if, as hereafter appears, it provides that army impedimenta is not to be shipped as baggage or free of charge.
The contract further provides that “when special cars or special trains are furnished, not less than the minimum of fares for such special cars or special trains will be' required.” This clearly indicates that if special cars or special trains are to be furnished they must be requested, and if requested, they will be supplied subject to the provisions and requirements of the special car and special baggage tariff of the company on file. No request was made in this case for either special baggage cars or special trains, which would seem to dispose of the matter of. the Government being entitled to special cars, as instead of requesting special cars the army impedimenta was billed as freight on Government bills of lading as requested by the Government official in charge of the shipment. However, as hereafter appears, the special baggage and special train tariffs in force could not be relied upon by the Government here, as it failed to fulfill in advance their special requirements.
The contract, further provides for the transportation, as baggage, without charge, of the personal effects of the soldiers up to 150 pounds, and for extra charge for excess baggage. (Finding V.) It further provides that “when provision is not made in the transportation requests for the transportation of excess baggage, collection will be made from the traveler at the regular commercial rate for weight in excess of the free allowance stated,” and further, that “excess baggage charges will not be subject to allowances applicable in connection with the fares for tickets under this arrangement. Baggage regulations in other respects than above will be in accordance with the tariff of the initial carrier checking the baggage in each case.”
*355 Section 2 of the paragraph providing for baggage is as follows:
“(2) Company, battalion, regimental, or Government property is not included in the above.”
Before proceeding to discuss the meaning of this baggage paragraph and leaving the matter of this contract, it may be well to point out that this court has held that the Government is bound by a contract with a railroad company for transportation under which contract it receives special terms and benefits not applicable to the general public, as follows:
Where the Government contracts for transportation at a special rate and the plaintiff had on file a special tariff at a less rate than that agreed upon, and which was known to the. Government but which was not applied for, and with the conditions of which the Government had not complied, the Government is bound by its contract, as an individual would be. Bush, Receiver v. United States, 52 C. Cls. 199.
Where the Government contracts with a railroad for special expedited service in transportation of troops and equipment, although there were published tariffs for freight-train service for the transportation at land-grant deductions, the Government was bound by its contract by reason of the special service provided for and rendered. Southern Pacific R. R. Co. v. United States, 53 C. Cls. 332.
Where a railroad has á net tariff rate for expedited special service covering camp equipment and impedimenta without further deduction for land-grant rates, and the Government orders and secures the special service specified in the tariff without stipulating for a different rate, and the service is rendered, the Government must pay said rate as contracted for. Yazoo & Mississippi Valley R. R. Co. v. United States, 54 C. Cls. 165.
Where a railroad company has notified the Government of special rates for special expedited service for transporting troops, their baggage and equipment, and the Government orders such service without objection to the rates and the special expedited service is rendered, a contract arose by which the Government was bound to pay the rate fixed by the railroad in its tariff for this special expedited service.' *356 Los Angeles & Salt Lake R. R. v. United States, 55 C. Cls. 305.
Where the Government contracts for special reduced rates for a full trip it can not claim advantage of a lower rate made by combining the party rate for a part of the distance and the individual rate for the remainder. The court held that the through individual rate which was contracted for was the only regular tariff rate which was applicable. Atchison, Topeka & Santa Fe R. R. v. United States, 55 C. Cls. 528 (no opinion) : decided by the Supreme Court, April 18, 1921, 256 U. S., 205.
Recurring to the provisions of the baggage paragraph of the contract of January 1, 1917, section 2 thereof is as follows :
“(2) Company, battalion, regimental, or Government property is not included in the above.”
What is the meaning of this section ? It is the part of the paragraph dealing with the transportation of baggage free. Two constructions can be put upon it, viz:
First. That company property, army impedimenta, etc., shall not be treated as baggage and shall not be transported free of charge as baggage.
Second. That company property, army impedimenta, etc., is expressly excepted by this section of the contract, from the contract.
Take the first proposition. This section is a part of the paragraph in the contract dealing with baggage, and the natural construction of the word “above” is that it refers to the preceding section in this paragraph. It is to be treated as if it were a proviso attached to the first section. It would thus necessarily mean that army impedimenta was not to be transported either as baggage or free of charge. If this construction be correct, that army impedimenta is not to be transported free as baggage under the contract, we face the question upon what terms is it then to be transported, as it is a necessary and practically constant concomitant of the transportation of troops? If the contract provides that it shall not be transported free as baggage, then the only other method of transporting it would be as freight at proper rates, as it was transported. No other special baggage tariff in *357 force outside of the contract can be applied, for the contract controls, which provides that army impedimenta, camp equipment, etc., shall not be treated as baggage.
Now take the second proposition, namely, that this section as to army impedimenta means that it is excepted, from and not included within the provisions of the contract. In that case, the basis of the shipment of army impedimenta and payment for the same must be found elsewhere than in the contract. There was no tariff of the carriers involved in this transportation in existence at the time of this shipment which specifically covered the transportation of army impedimenta. This being the case, it could only be shipped as freight under the regular freight rates, or as baggage under the special provisions of some baggage tariff of these carriers then on file. . This brings us up to the question whether army impedimenta comes within any of the provisions of the baggage tariffs of these carriers on file at the time. i
The initial carrier here was the Wabash Railroad Company and its baggage tariff, and the general provisions thereof not being in conflict with the tariff of the Missouri Pacific Railroad Company, the ultimate carrier and the plaintiff in this case, will control. Extracts from the tariff of the Wabash Railroad Company and the provisions of the tariff of the Missouri Pacific Railroad Company that are here applicable are fully set out in Finding II. These tariffs are the special tariffs applying to special baggage cars and special trains, and as they are special tariffs involving special rates the railroad company has the right to limit them by special restrictions and requirements to be fulfilled before the special concessions therein can be demanded or secured.
These tariffs contain no specific mention of, or provisions for, the transportation of army impedimenta, company, battalion, regimental, or Government property. Army impedimenta can only be brought within their provisions by analogy and approximation to the subjects and the organizations and aggregations therein mentioned. Whether this puzzle of approximation and analogy is one for this court to work out and whether it is within its jurisdiction to work *358 it out and decide it, is a question which will be discussed later. For the present let us see what were the provisions of these tariffs as applicable to the case in hand; how far they can be applied to the transportation of army impedimenta free of charge as baggage in the light of these provisions of the aforesaid contract of January 1, 1917, which, among other things, provides for the transportation of troops at 5 per cent less than the regular rates, the basis upon which the Government paid for the transportation of troops here involved.
Now as to the provisions of these tariffs:
First. It is provided that special baggage cars will be furnished “without additional charge to party traveling together in regular cars and presenting the equivalent of twenty-five or more adult tickets purchased at current rates."
It will .be seen from this that in order to secure the benefit of a special baggage car free for each 25 persons the tickets for their transportation must have been “ purchased at current rates.” The tickets for the soldiers transported in the instant case were not purchased and paid for at “current rates,” but at 5 per cent less than current rates, and the Government having failed to comply with this requirement can not claim the service named in the tariff.
Second. It is further provided that should any movement of the character referred to in this section — namely, circuses, carnivals, amusement companies, etc. — “require more than three baggage cars or four box cars it will be treated as a freight movement, and must be waybilled as freight as provided.” So that, all that could,- in any event, have been claimed under this tariff in the way of free baggage is limited to three baggage cars or four box cars. The balance, it is distinctly provided, shall be moved as freight and way-billed as such.
Third. It is provided that the supplying of these special cars shall be subject to the ability of the company to furnish the necessary equipment at the time wanted, and that no equipment will be furnished until request — that is, “ for the free baggage cars” — has first been referred to the proper officer and he has decided that the equipment can be arranged for. There was no such request and no such pre *359 arrangement in this case. The Army impedimenta in this case was shipped as freight at the Government’s request on Government bills of lading prepared by Government officers. This seems to clearly dispose of the question as to whether the Government in the instant case was entitled, under the special baggage tariff applicable to the shipment, to a baggage car free for each twenty-five soldiers transported, in which to transport Army impedimenta.
While the foregoing conclusions dispose of this case in favor of the plaintiff, it seems a fit occasion to discuss another phase of it, inasmuch as cases involving similar questions appear to be constantly recurring here.
As heretofore pointed out, this proceeding involves an effort upon the part of the Government to have this court apply a railroad tariff by analogy and approximation, by the inauguration and adoption of a sort of cy fres doctrine of application; in effect, to hold that the aforesaid special baggage tariff, allowing a baggage car free for each twenty-five persons or more traveling together, applies to Army impedimenta, and that such impedimenta is baggage within the terms of that tariff, and that the application of the tariff by the railroad company, holding that impedimenta is not baggage and can not be transported under the rates there provided, is unreasonable and discriminatory.
Section 22 of this interstate commerce act provides:
“ Nothing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies.” 24 Stat., 379, 387.
The courts have held that the tariffs established by the Interstate Commerce Commission are fixed rules of law and that where no serious question of the application of rates or discrimination arises the Federal courts (not including this court) have concurrent jurisdiction to award actual damages suffered by reason of the violation of these tariffs. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426; Pennsylvania Railroad Co. v. International Coal Mining Co., 230 U. S., 184, 196, 197; Sections 8 and 9, Interstate Commerce Act, 24 Stat., 382.
*360 In the case of Texas & Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S., 197, 232, the court said:
“ Subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at the common law, free to make special contracts looking to the increase of their business, to classify their traffic; to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits.”
There were no tariff schedules in force at the' time of this transaction in terms fixing the rates for the transportation of camp equipment, camp property, or other Government property, and any rate in existence could only be applied by analogy and approximation, which is what this court is asked to do in this case. This is a matter for the Interstate Commerce Commission, whose jurisdiction to establish rates and determine questions of discrimination is exclusive.
In the case of Texas & Pacific Ry. Co. v. American Tie Co., 234 U. S., 138, the company had a tariff schedule for lumber. An effort was made to get the court by analogy to apply this tariff to railroad ties. The court declined to do it, and held it was a question for the Interstate Commerce Commission.
The very purpose of the interstate commerce act was to provide uniform rates after a hearing, and investigation of all the facts and circumstances, and to do away with the conflict and confusion which existed by reason of the conflicting and confusing decisions of the courts on the question of discrimination and unreasonableness of rates and their application. The carrier can not depart from these rates as fixed or apply them in a discriminatory or unreasonable manner without incurring penalties.
In the case at bar the question is one of fact under all the circumstances, is administrative in character, and is for the decision of the Interstate Commerce Commission and not this court. However, as pointed out above, carriers under the interstate commerce act and at common law are not for *361 bidden to discriminate, provided discrimination is not unjust and unreasonable under all the circumstances as “between persons and traffic similarly circumstanced,” provided “ the service is like and contemporaneous service,” rendered “ under substantially similar conditions and circumstances.”
Were the persons and traffic involved here similarly circumstanced as regards the general public and such aggregations as theatrical companies, dog shows, baseball teams, etc., intended to be covered by such special baggage tariff? It must be borne in mind when dealing with the question of transportation of army impedimenta that the “person” who is being dealt with is the Army of the United States, where a shipment of two regiments, or 6,000 men, under the application of this tariff asked for by the Government, would require approximately 240 baggage cars, more, probably, than the company possessed and almost certainly more than it could command for the purpose.
A discrimination between parties not “similarly circumstanced,” in other words, parties who do not compete with each other, is not a discrimination within the meaning of the act. It has been contended in this case that because this tariff allows certain special rates to theatrical companies, it should therefore allow the same to the Government. There is no 'competition between the Government and theatrical companies. They are not in the same class. They are not similarly circumstanced. There are various reasons of business policy which could be adduced for granting this rate to theatrical companies that would not apply to the Government. The Government in the transportation of soldiers does not, financially or in any other way, come into competition with any of the parties given special rates under this tariff, and consequently there can be no unjust discrimination and no cause for complaint. If the rates given these parties should be conceded to be illegal, there would be no reason why the Government should be allowed illegal rates. If the rates are not unjustly discriminatory, they are justifiable. These party-rate tickets secure patronage which yields large revenue to the railroads. The withdrawal of these tickets would destroy that patronage. These and other considerations must be taken into account in determining *362 whether there has been “ like and contemporaneous service ” rendered “under substantially similar circumstances and conditions.” The traffic provided for in the company’s schedules has no anology or resemblance to that carried on by the Government. It is not “like and contemporaneous service under substantially similar circumstances or conditions.” It was held at common law, and under statute at one time, lawful to allow ministers of the gospel to travel on half-fare tickets upon the theory that they did not come in competition with business men and that no injustice was done to anybody. There is no analogy or likeness between the business of the Government in the transportation of soldiers of an army and the various classes described in the company’s schedules. The Government’s business is not like that of a theatrical company any more than it is like that of a brass band or a football team. It is not a party of like character to any of these, regularly organized for the purpose of giving exhibitions and traveling together. It is not engaged in the same business as any of these classes that are given special rates. It is not in competition with them, and therefore is not injured or discriminated against; and consequently, its contention that it is entitled to the benefit of these schedules can not be upheld.
It follows from the foregoing that in any view of this case the plaintiff should recover, and that judgment should be entered in its favor for the amount claimed in its petition.